**AGUDAS CHASIDEI CHABAD OF UNITED STATES, Plaintiff,**

v.

**Barry S. GOURARY, Defendant.**

and

**Hanna Gourary, Defendant-Intervenor.**

No. CV–85–2909.

United States District Court,
E.D. New York.

Jan. 6, 1987.

Miller Cassidy Larroca & Lewin, Washington, D.C. by Nathan Lewin, Seth P. Waxman, and Schnader Harrison Segal & Lewis, Philadelphia, Pa. by Jerome J. Shestack, and Schlam Stone & Dolan, New York City by Richard Dolan, for plaintiff.

Stroock & Stroock & Lavan, New York City by Alvin K. Hellerstein, Brian M. Cogan, Elizabeth A. Mullins, for defendant and defendant-intervenor.

## MEMORANDUM DECISION AND ORDER

SIFTON, District Judge.

This is a diversity action for replevin, also alleging conversion and trespass, that was commenced on August 5, 1985, to recover some 400 books or the proceeds of their sale said to be in the hands of defendant Barry S. Gourary. Defendant Barry Gourary has counterclaimed for a judgment declaring that the 400 books, as well as the balance of books and manuscripts which form part of a library housed at a building at 770 Eastern Parkway, in Brooklyn, New York, owned by the plaintiff, belong to him and his mother, intervenor Hanna Gourary.

On November 22, 1985, this Court determined that a trial should proceed before the undersigned, sitting without a jury, with respect to the issue whether the library which is the subject of the litigation was part of the estate of Rabbi Joseph Isaac Schneersohn, the grandfather of Barry Gourary and the father of Hanna Gourary, at the time of the Rabbi's death in 1950. Separate trial of this issue was deemed appropriate since the issue forms the core of defendants' counterclaim and of defendant Barry Gourary's defense to plaintiff's claims in replevin and for conversion, namely, that the library belongs to his mother and to him as a result of inheritance from his grandfather, Rabbi Schneersohn.

Trial of this issue took place in December 1985. Post-trial submissions were completed in March 1986. From April through October 1986, this Court was engaged in the trial of a multi-defendant criminal case. After hearing the testimony at trial and after review of the voluminous documentary evidence introduced by both sides, I conclude that the library was not part of the estate of Rabbi Joseph Isaac Schneersohn at the time of his death. Accordingly,

defendants' counterclaims must be dismissed. Since it is undisputed that, except by right of inheritance, defendants have no rights in the library and that plaintiff has at least a right of possession, plaintiff is entitled to judgment with respect to its action in replevin. What further proceedings are appropriate with respect to plaintiff's other claims will be determined after the parties have had an opportunity to consider the issue in the light of this opinion. What follows sets forth the findings of fact and conclusions of law on which these determinations are based as required by Rule 52(a) of the Federal Rules of Civil Procedure.

Plaintiff is a corporation formed under the religious corporations law of New York on July 25, 1940, with its principal, if not only, office at 770 Eastern Parkway, Brooklyn, New York. At present, it is responsible for administering the burial society or *Chevra Kadisha* of the Lubavitch Chasidic community and for maintaining the building at 770 Eastern Parkway which serves as headquarters and synagogue for the community. In this latter capacity, plaintiff has possession of the library at issue in this litigation and had possession of it at the time when defendant removed certain books from it.

Defendants, as already noted, are among the direct lineal descendants of Rabbi Schneersohn, who was until his death the sixth in a line of rabbis who led a movement of Orthodox Jews known as Chabad Chasidism.[1] Chabad is an acronym for the Hebrew words *"cochma," "bina"* and *"daas,"* meaning wisdom, knowledge and understanding. As its name suggests, Chabad Chasidism has been considered as placing a greater emphasis on the intellect in the study of the Torah and the Kabbale than is the norm in Chasidism.

Chabad Chasidism was formed in 1775 by Rabbi Schneur Zalman, considered the first Lubavitcher Rebbe and known as the Alter Rebbe. The Alter Rebbe was a disciple of the successor of the Baal Shem Tov. The founder's son and successor, Rabbi Dov Baer, who died in 1827 and was known as the Mittler Rebbe, settled in the Russian town of Lubavich and, hence, gave the movement its present name. The third leader of the group was the son-in-law of Dov Baer and the son of the daughter of Schneur Zalman. This Rebbe, known as the Tzemach Tzedek, after the title of his major written work, was Rabbi Menahem Mendel, who died in 1866. The fourth Lubavitcher Rebbe was the youngest son of Menahem Mendel, Rabbi Samuel Schneersohn, known as the Maharash. He was succeeded by his son, Rabbi Shalom Dov Baer, known as the Rashab, who died in 1920. The sixth Rebbe, with whose estate we are concerned, was the son of Rabbi Shalom Dov Baer and succeeded his father on his father's death. The sixth Rebbe was succeeded by the present Rebbe, Rabbi Menahem Mendel Schneerson, who is a son-in-law of Rabbi Joseph Isaac Schneersohn and a great-great-grandson of the Tzemach Tzedek. This family relationship between the various generations of succeeding Lubavitcher Rebbes may explain why the issues raised by this lawsuit have not been clarified earlier, i.e., the distinction between property of the religious institutions of Chabad Chasidism and the personal property of the Rebbe is not a distinction which has had to be made with any regularity in the movement's history.

The library at issue is appropriately divided in two parts for purposes of this discussion: first, the *ksovim*, manuscripts either in the handwriting of the Lubavitcher Rebbes or recording oral statements by

---

1. Chasidism, the movement of Chasidim (literally, the "righteous"), was founded in the mid–18th Century in Eastern Europe by Rabbi Israel ben Eliezer, known as the Baal Shem Tov ("Master of the Good Name"). The teachings of the Baal Shem Tov emphasized the presence of God in all things, including the most mundane. The movement was in its origin intensely community oriented and centered on leaders, gener-

ally disciples of the Baal Shem Tov, who served as mediators between the Chasid, God and the society outside the community. The movement divided itself into several groups centered on individual leaders and local communities, one of which was Chabad Chasidism, which became known as Lubavitch Chasidism after the town in Russia in which the movement was centered in its early years.

the Rebbes to their followers, both passed from Rebbe to Rebbe; and second, over 40,000 texts, printed and handwritten, collected by or under the direction of Rabbi Joseph Isaac Schneersohn in the 1920's and after. Both the *ksovim* and Rabbi Joseph Isaac Schneersohn's collection were, undoubtedly, in their origins personal property of the Rebbe, albeit property used to serve the purposes of Chabad Chasidism.

The defendant Hanna Gourary has described the extraordinary consideration given the *ksovim* as follows:

"Q: Why do you make a difference between the books and the *ksovim?*

A: Because the *ksovim* ... are sacrosanct to the family. My grandfather [the Rashab] and my father [Rabbi Jacob Isaac Schneersohn] sacrificed very much for the *ksovim.* They used to take them along with them summertime on vacation, and put them in boxes with metal inside. The boys used to follow and watch it. They used to take it along in the summertime when they went away for three months. And then they were saved in St. Petersburg from the GPU. They had to give up colossal matters for them. When my father was arrested and imprisoned he said you must save lives and the *ksovim.* Nothing else mattered to him. And that's the way it was when he had to leave Russia, when we had to escape from Warsaw. *Ksovim* should remain with the family. Even my great-grandfather [the Maharash], when they were burning the towns around, had horses ready 24 hours around the clock in case it would be necessary to flee to save the *ksovim.*"

The reason for such special consideration accorded the *ksovim* appears to be the extraordinary significance attributed to the Rebbe's words by Chabad Chasidism. As described by one expert:

"Number one, insofar as it is the Rebbe who expounds on Hasidic philosophy, and these can only be based on the founda-

tion of his predecessors, that they laid down the basic premise of what the Hasidic religion is about. Therefore, it becomes highly significant that each successive Rebbe would have sufficient manuscripts on which he can base his own commentaries, his own discourses....

"The second level, the *ksovim* that are original manuscripts or manuscripts used by the Rebbe himself, assume a sanctity about them, that they are kind of the essential legacy. I would compare it to the crown jewels. It's something concrete that is passed on in a symbolic way, and in a way incorporates in itself both the sanctity, the very presence, the very personality of the Rebbe [himself]."

Reputation as to events of general history important to the Lubavitcher community has it that the *ksovim* of the Alter Rebbe and the Mittler Rebbe were collected by the Third Rebbe, the Tzemach Tzedek, who added to them his own manuscripts. This collection was thereafter acquired by the youngest of six sons of the Tzemach Tzedek, the Maharash, apparently over the protests of the other five sons. A similar dispute over the ownership of the *ksovim* occurred in the next generation when the Rashab became the Fifth Rebbe. In a letter to a friend and prominent Chabad rabbi, Yitzchok Wilensky, the Rashab wrote of threats of litigation with his two brothers over ownership of the *ksovim.* Apparently, however, the Rashab took custody of them, justifying his actions both in terms of religious tradition and ordinary property law concepts. From the Rashab the *ksovim* passed to Rabbi Joseph Isaac Schneersohn by will. The will provided that "all the books, except for those itemized below, I leave as an inheritance to my son." A limited number of books were left to the Rashab's granddaughters "obviously in order that they give these to their husbands for study." Throughout its long history, the collection appears to have been added to by acquisition or gift. For example, what is said to be the only known surviving letter in the handwriting of the Baal Shem Tov is described as having been acquired

by a wealthy Chasid from one of the two grandsons of the Baal Shem Tov for one thousand gold rubles and given to the Rebbe to form part of the *ksovim*.

The larger part of the library at issue in this lawsuit are the *seforim* or less than sacred books which became known as the Lubavitch library, a collection of over 40,-000 volumes and manuscripts collected by Rabbi Joseph Isaac Schneersohn over the course of his life. While this portion of the library was not acquired by inheritance, it is clear that the collection, possession and study of a large library was part of the function of each successive Rebbe, at least from the Third Rebbe on. Thus, Rabbi Joseph Isaac Schneersohn is recorded as stating:

> "My grandfather [the Maharash] told me that in his father's [the Tzemach Tzedek] library there were five open bookcases filled with books and two closed bookcases filled with manuscripts ... and six further bookcases, opened ones filled with books, stood in the nearby room."

According to defendant Hanna Gourary, "the library occupied three rooms by my grandfather [the Rashab], all the walls." Both the Rashab and his son, Joseph Isaac Schneersohn, were described as collectors of *seforim*. Indeed, Rabbi Joseph Isaac Schneersohn so described himself.

While each of the Rebbes appears to have treated the library as personal property, disposing of it by will for example, there can also be no question that the library came to be conceived as one to be used for the benefit of the religious community of Chasidim by the leader of the community, the Rebbe. Thus, just as the Fifth Rebbe, when it became clear that he would succeed his father, made it his business to collect the family *ksovim*, so the Fifth Rebbe made it explicit in his will that

the bulk of the *seforim* with certain itemized exceptions were to pass to his own son, Joseph Isaac Schneersohn. As one expert testified, the Lubavitch Rebbes have, for generations, had "very large working libraries."

The large library of the Fifth Rebbe, described above by Hanna Gourary and inherited by Rabbi Joseph Isaac Schneersohn, was confiscated by the communist government in the Soviet Union. According to Mrs. Gourary the Sixth Rebbe attempted to repurchase the library, but the Soviet government "wanted too much money. My father didn't have the money, so he couldn't redeem the library." As it is described by the man who eventually became the librarian of the Lubavitch library, Rabbi Chaim Liberman:

> "Once they [the Soviet government] confiscated his library, he was forced to borrow *seforim* when he needed them. So, of course, he needed a library. He had to buy it.... [A] rabbi, an ordinary rabbi, especially a Rebbe, couldn't get along without a library."

A means of acquiring a working library presented itself in the form of the personal library of the former head of the Asiatic Museum in Leningrad, Shmuel Wiener. The library was purchased pursuant to a contract of sale with the Rebbe agreeing to pay Wiener fifty dollars a month over a period of years. The reference to a purchase price in American dollars was in apparent recognition of the fact that, as of the date of the purchase in 1925 and subsequently, the Rebbe was principally dependent on contributions from a sizeable group of followers of the Lubavitch movement living in the United States, who had, by that time, become known as the Agudas [2] Chasidei Chabad of the United States and Canada, an unincorporated association and a predecessor of plaintiff.[3] While the fact that the library was acquired from funds collected as religious contributions known as *ma'amad* [4] by members of the Lubav-

---

2. The word "agudas" in Hebrew means union.

3. Also existing at least as early as 1924 was another of plaintiff's predecessors, Agudas Chasidim Ansheim Chabad of the United States, Inc., a membership corporation, formed in 1924 and dissolved by the Secretary of State in 1952 for inactivity, pursuant to § 57 of the N.Y. Membership Corporations Law.

4. *Ma'amad,* in Chabad Chasidism, constitutes in the words of one expert "a personal gift from the individual to the master ... *ma'amad* ... from disciple to master in order to create that bond of souls between them."

itch movement does not, as plaintiff argues, in and of itself, make the library acquired with the funds trust property or property belonging to the community, it does serve to emphasize the religious purpose for which the library was put together. This is further apparent from the manner in which both *ma'amad* and other gifts to the library were solicited from the Chabad community.

The librarian Liberman testified that in addition to buying Hebrew pamphlets from the Soviet censor "by the pound," books were acquired by gifts solicited by advertisement such as the following, placed in the American rabbinic journal *Ha Pardes:*

"The Lubavitch library of the Rebbe, Rabbi Joseph Yitzchok Schneersohn of Lubavitch, thanks the honorable rabbis, authors and publishers who sent their works and their publications as a gift to the library, and requests that the honorable rabbis, authors and publishers continue to honor them in the future with gifts of everything they publish or print, whether they are books on any topic, announcements, broadsides or notices of any kind.

The Address:

Bibliothek Lyubawitch

Pulko, Briero 1015, Riga"

Similar efforts at solicitation emphasizing the communal nature of the library were made after the Rebbe left Latvia for Poland. An advertisement from this period states:

"The rabbis, authors and publishers that sent their books to the Collection of Books and Manuscripts "Lubavitch" of the Rebbe, Rabbi Yosef, may he live and be well, Schneersohn, are asked to send from now their books to our new address:

Rabbi J. Schneersohn

for Library "Lubavitch"

Euronowska 7/9 Warsaw, Poland"

In late 1933, Rabbi Liberman, in his capacity as "director of the Lubavitch Book and Manuscript Collection," sent a letter to the British scholar and collector David Sassoon:

"Allow me to turn to you, honorable and exalted, in the name of the Collection of Books and Manuscripts 'Lubavitch,' with the request that you graciously send us a gift to our library your book 'Ohel Dovid,' as many other authors and publishers have as a custom that they send their works and publications to us as a gift. "We trust that your honorable and exalted will fulfill our request, and we thereby thank you in advance."

Other letters in evidence written by Liberman or by Rabbi Schneersohn seek gifts "in the name of the library," "for us," or for "our library," "the library," or for "the Lubavitch Library" from "whoever knows and honors the name of Lubavitch."

*Ma'amad* was also used by Liberman and the Rebbe to purchase books to enlarge the collection. The fact that the Rebbe was afforded almost complete discretion in deciding on the application of the money does not detract from the fact, apparent from the evidence, that monies he received in the form of *ma'amad* he considered as received to further the purposes of the religious community of which he was the leader.

According to Dr. Louis Jacobs, an acknowledged scholar on Chasidism, unlike other Chasidic groups which support their rebbes by gifts known as *pidyon* (redemption) or *pidyon nefesh* (redemption of the soul) delivered personally to a rebbe, Lubavitch Chasidim primarily support their Rebbe and the community institutions he directs through an organized, regular program of contributions collected by emissaries of the Rebbe. The contributions are known as *ma'amad* (meaning support or dues) or *ma'amad bais chayenu* (literally, support for the house of our life). Dr. Jacobs explained: "It is a due, for which every member of of the movement is expected to consider himself responsible, and ... there is an amount according to means which every member pays or is expected to pay." Whereas *pidyon* is "a personal gift, as it were ... for [spiritual] services rendered" by the Rebbe, *ma'amad* "is best

compared to membership dues of a learned society or a sacred society, and the dues are expected as [a] token of membership."

*Ma'amad* is provided to support the Rebbe in his needs and those of his family and also to support the community institutions he oversees. An itemization by Rabbi Schneersohn in his own hand of *ma'amad* expenditures separates the expenditures into six categories: *Hakria v'Hakedusha* (a monthly publication of the movement), books, free loans, charity, personal expenses, and salaries and telegrams, etc. As one exhibit reveals, of the $18,481 accounted for by Rabbi Schneersohn, only $2,102, or roughly 11%, was classified as personal expenses. Dr. Jacobs concluded that "it seems as clear as can be that the *ma'amad* is for the upkeep of the organization."

The library put together in this period from gifts and acquisitions was described by Chaim Liberman, its librarian, as follows:

"What he meant was a library for researchers, scholars, who would come to him to use his private library. Just as there are large libraries, such as the Seminary Library here or the British Museum Library where researchers come in, he wanted the same thing by himself, on a private scale. His own library would be open to researchers who came in."

The Sixth Rebbe's daughter, the defendant Hanna Gourary, also describes her father's library as a library for researchers. Rabbi Liberman quoted the Rebbe as saying in this period of time that he contemplated a fifteen-year period of collecting books:

"What will happen in fifteen years, we will have time to worry about when it happens. Maybe they will find a wealthy donor who would buy a building and put his name on it, just the way it's done throughout the world, elsewhere in the world."

This community purpose for the library is confirmed by the nature of the books collected. Rabbi Liberman testified that he gathered for the library books of all kinds relating to Jews and Judaism and that the collection was not limited to rabbinic or sacred writings in Hebrew. In fact, he testified, some of the books he obtained were so far beyond the acceptable standards for a Chasidic Rebbe that he could not acknowledge that he was buying these books for the Rebbe and instead said he was buying them for a library in Riga.

One expert who testified about the types of books found in the library stated that they found among them "a large number of books ... which the Rebbe would not read but which contain opinions which he would consider to be heretical, and which he would strongly discourage his followers from reading," including anti-semitic material and communist writings in Hebrew. Since the Chasidic movements were hostile to literature that is not "sacred," the expert, Dr. Jacobs, believed that "its contents [are] very strange for a Chasidic Rebbe to have." Therefore, he concluded:

"It seems to me the only way this library makes sense is to encourage research, and that means that there is an appreciation of the value of objective research. But it also means that it's a research library.... It only makes sense to me if this is done for someone or something, some institution's prestige.... And if it were done for prestige, it would be the prestige of the movement. Otherwise I can't make any sense of it at all.... I can't imagine a Rebbe acquiring this kind of library, which, as we said, contains material which by no stretch of the imagination could be considered a personal library for the Rebbe's personal use."

The problems of conveying this community asset from generation to generation of Rebbes might have remained, as it had in the past, one to be sorted out among members of the Rebbe's family through the laws relating to private transactions, including those of inheritance and sale, had it not been for the holocaust.[5] The effects of

---

5. Hanna Gourary's account of mechanism by which *ksovim* passed from Rebbe to Rebbe in the generations preceding the Sixth Rebbe

seems to describe accurately the way in which property, regarded within the community as a community asset to be used by the community's

the holocaust included, among others, a necessity for the Rebbe, during his life and not simply in contemplation of his demise, to define for the outside world the relationship between himself, the community he served, and the property he possessed.

The unsuccessful efforts of Americans to rescue the library from the Germans during the Second World War is only a footnote to the by-and-large successful efforts of plaintiff and others to secure the safe passage of the Rebbe and most of his family to this country. In September 1939, after the outbreak of the war, the Rebbe left Otwock, Poland, for Warsaw. The address where he registered in Warsaw was the subject of bombings which destroyed the building. The Rebbe, however, fled to a relative and then went into hiding. The library was, however, not destroyed but left behind in Otwock. In December 1939, the Rebbe, with the assistance of the American government, left Warsaw for Riga. Prior to his departure from Warsaw in November 1939, the Rebbe wrote to Rabbi Liberman, then in Latvia, in German, a description of his circumstances and that of his library, which Liberman immediately forwarded to plaintiff's representatives in New York.[6] The letter from the Rebbe, as quoted by Liberman in his letter to New York, states:

"I have no apartment, and I find myself living with friends with my entire family in one room; consequently, I have no space for the books which Agudas Chabad loaned me for study. I would be pleased if Agudas Chabad were to take these books back."

Both Liberman and those to whom this message was conveyed in the United States interpreted this letter as an appeal to Agudas Chabad for its assistance in securing the passage of the books to America. Liberman's letter was immediately forwarded by Rabbi Israel Jacobson, the then President of Agudas Chabad, to Samuel Kramer, a New York lawyer who had already been working for several months to effect the escape of the Rebbe and his family to the United States, with the comment: "This letter from the Rebbe refers to his valuable library which he would like to get out from Poland, as the property of Agudas Chabad." Kramer and Max Rhoade, a Washington attorney retained by Agudas Chabad, then communicated a few days later with Robert Pell, then Assistant Chief of the European Desk at the State Department, concerning the library as follows:

"Another angle of the situation has developed, which seems to require immediate action by cable.

"Rabbi Schneersohn and his colleagues of the world Chabad hierarchy, upon their evacuation from Warsaw were obliged to leave behind them at the Central Rabbinical College, Tomche Tmimim

---

leader, was nevertheless treated as personal property within the Rebbe's family:
Q: So the *ksovim* should stay with the Chasidim of Lubavitch?
A: No, with the 'mishpacha,' no. By the family.
Q: By, quote, the family, close quote, you mean the person who is accepted as the Lubavitcher Rebbe, right?
A: Not with the one who is accepted, but the ones who are the closest family, not Chasidim, with the closest heirs in the family.
Q: Are you testifying that *ksovim* should be *given to someone who is not the Rebbe?*
A: Heirs.
Q: I understand. But to heirs who are not the Rebbe or Chasidim of the Rebbe?
A: Certainly, to the closest heirs, certainly.
Q: And can those heirs sell the *ksovim?*
A: I don't know. By us nobody sold *ksovim.* In regard to my grandfather, his sister received *seforim* from my great-grandfather,

their father, and she sold them to a brother but only within the family.
As Hanna Gourary's example from the Fifth Rebbe's life illustrates, although private property law was resorted to, the net effect of the inheritance and sale was that the *ksovim* passed from Rebbe to Rebbe. As Rabbi Liberman stated:
Q: Those *ksovim* went from one Rebbe to the next Rebbe, right? In other words, when you say it is a family thing it means from one Rebbe to the next Lubavitcher Rebbe?
A: It didn't always work that way. If a Rebbe had several sons one of them may have taken part of the *ksovim,* too, in all likelihood. But generally the majority seems to have gone from one to the next."

6. Technically the predecessor of plaintiff since plaintiff was not incorporated until the next year.

in Otwock, near Warsaw, Poland, the valuable library of religious books and manuscripts, used by the Rabbi and the Rabbinical College, but which is the property of the American branch of the denomination, Agudas Chasidei Chabad of the United States and Canada.

"As the Nazis have quite a record for destroying literature, and in view of the plans now in progress to transfer the seat of the world hierarchy to the United States, I have been asked by Agudas Chasidei Chabad to request you to please cable at its expense, which I guarantee, to the American Consulate along the following lines:

'Ask Rabbi Juda Eber Deam of Central Rabbinical College Tomche Tmimim in Otwock to confer with you regarding shipment library religious books manuscripts to Agudas Chasidei Chabad One Eight Three Henry Street New York City which as American branch world Chabad is owner of library. Stop. Extend all possible cooperation in shipment plans including arrangements with authorities for shipment via Italy and cable amount funds necessary for that purpose which will be forwarded for expenditure under your supervision.' "

In response to this letter from Rhoade, Pell wrote:

"Confirming our telephone conversation of this morning, in order for this Government to take action regarding the removal of the religious library to which you refer in your letter of December 23, 1939 from Otwock to the United States, we must have an affidavit in triplicate proving that this library is American property and showing how title was acquired and when. As soon as we have this information the necessary action can be taken."

At the same time, the Rebbe, now himself in Latvia, wrote directly to Rabbi Jacobson in New York concerning the library as follows:

"Surely I will receive within a few days a detailed letter about all that has been done for the saving of my library and about taking it out from there.... 

There are about a hundred and twenty boxes of books and three boxes of manuscripts of our revered and holy parents; the saintly Rabbis ... and you will surely do all you can to bring them to your country. There are also the remainder of our other valuables that was left over after the great conflagration. As Rabbi Feigin has already written you, there is also the jewelry, etc., that was left over, and I ask you to do all you can to bring them over. Please write, or better still, telegraph to the American Consul in Berlin that he inform the Consul at Warsaw that he take over the library of Agudas Chabad (of the U.S.) and of Rabbi Schneersohn—for I have told them that a part of the library is the property of Agudas Chabad of New York and a part is mine, and that it is located in Otwock, near Warsaw, in 6 Prussa Street, and a smaller part in Warsaw, in 7 Nalevka Street, Apartment 16. There are also three cases of sacred manuscripts which are the property of Agudas Chabad of the U.S. and that they send everything direct to New York.

"I have already advised several times by telegram, and also my son-in-law (Gourary) has spoken with you several times over the telephone about the books and the manuscripts and you have as yet not answered anything. I repeat and say and request most earnestly that you kindly hasten this matter as soon as possible."

It is apparent from the record of correspondence left behind that the Rebbe's comments concerning ownership of the library ("for I have told them that a part of the library is the property of Agudas Chabad of New York and a part is mine") were somewhat bewildering to his followers and representatives in the United States. A request by Rhoade to Jacobson for the affidavit of ownership and title requested by the State Department was responded to by Jacobson as follows: "I am sending you under separate cover the affidavit for the books, but will have to consider the matter of the evidence for same." A memo from Kramer to Rhoade states:

"Last night I had a long talk with Rabbi Jacobson about presenting sufficient facts to establish ownership of the library in the American Chabad. There is some difficulty involved in the gathering of those facts. It may require Rabbi Jacobson's telephoning to Riga. For that reason I have held in abeyance a cable to Haifec about it. We might as well wait until we 'clear the atmosphere' and get all the basic facts, after which we can decide upon the proper procedure."

An unsigned and conclusory affidavit of Jacobson included in the record simply states: "The assets of the American denomination includes a library of religious books and manuscripts ... now housed in the Central Rabbinical College, Tomche Tmimim at Otwock, near Warsaw, Poland." In late January 1940, Rhoade writes to Kramer that he is still "awaiting the proof of the American Chabad's title to the library before I can do anything further regarding that particular problem." No more is heard of the matter from the American side until after the war.

From Latvia, immediately before his departure from Sweden and thence to the United States, the Rebbe made one final effort to secure the departure of the library for American through a German attorney. The letter in German appears to contradict earlier descriptions (also in German) of the library as belonging at least in part to Agudas Chabad:

"In response to the telegram which I received from the forwarding firm Schenker & Ko., I sent you on 31 January 1940 a communication with the following content:

'I, Rabbi J. Schneersohn, citizen of Latvia, hereby affirm that my Library, which consists of Hebrew books exclusively and which is located at 6 Prussa, Otwock, formerly Poland, is indeed my property.

'In addition, I am requesting you to deliver to Schenker & Ko. the previously-described books which are packed in some 135–145 boxes, in order that they may be forwarded in accordance with my instructions.'

This letter was here in Riga notarized, and it was legalized by the German Consulate. For your information, I am attaching hereto a letter, signed by two witnesses, which the Latvian Ambassador in Berlin had sent to you. It confirms that I came from Warsaw to Latvia in December 1939, and that this Library belongs to me.

Since I shall be moving to America on 28 February, I request you to contact the firm of Schenker & Ko. and to cause them to send my above-mentioned Library to New York via Italy. It should be sent to my name at your officer there.

The crates in which this Library is packed are old, and they bear many different inscriptions and stamp impressions. This may lead to errors along the way. Accordingly, I request that you should take care to have these other stamps and inscriptions removed so that only my initials remain.

As far as the 11 crates of household goods are concerned, please have these sent along with the Library.

I thank you for your efforts, and I look forward to receiving your response by return mail. With best wishes and best regards."

Neither the description of the library as belonging to Agudas Chabad or as belonging to the Rebbe succeeded in convincing the Nazis to permit the transportation of the books to America. They remained in Poland throughout the war.

Rabbi Joseph Isaac Schneersohn arrived in America in mid-March 1940. In July of that year, plaintiff was incorporated and acquired a building at 770 Eastern Parkway where the Rebbe and his family took up residence and remained for the balance of the Rebbe's life.[7]

---

7. The formal incorporation of plaintiff for the purpose of acquiring 770 Eastern Parkway appears as part of a pattern of increasing sophisticated regularization of Chabad Chasidism's legal status *vis à vis* the societies in which it existed. As early as 1938 a letter from one of the Sixth's Rebbe's assistants to Rabbi Israel Jacobson states:

"After the long silence concerning the purchase of a court and a house for [one of the

In 1946, following the war's end, the Rebbe again took up the effort of securing the transportation of the library to America. Although considerably less documentation exists concerning this effort than exists with regard to the efforts to secure the escape of the Rebbe in 1939 and 1940, one extraordinary letter exists which sets forth clearly and unambiguously the relationship between the books, their owners, and the community. It reads as follows:

"To the renowned scholar, Dr. Alexander Marks

Greeting and blessing!

After the Nazi occupation of Poland in [1939], the evildoers confiscated of several boxes full of aged manuscripts and valuable books which had been kept in my library in Otwock. These manuscripts and books—besides others added later—were the personal library of the well-known librarian Shmuel Wiener from whom I once bought it.

Manuscripts: Three large boxes full of aged manuscripts were confiscated, as mentioned, by the Nazis. Among these manuscripts are some from the author of the Tanya and from the five generations of Chabad leaders coming after him, during a period of about 150 years. These manuscripts are on the subject of Chasidism and also *Halacha* [Jewish law], among them many manuscripts—letters and correspondence—which are a packed treasure-house on the subject of our people's history in the land of Russia during the past two centuries.

These manuscripts are registered under the names of the Rabbis, members of Agudas Chasidei Chabad, Rabbi Israel Jacobson, and his son-in-law Rabbi Shlomo Zalman Hecht, both American citizens, (who are) the official owners of this property.

Books: Several thousand books, among them many ancient books of great value and very rare. These books are the property of Agudas Chasidei Chabad of America and Canada.

Before the United States entered the War, the State Department conducted negotiations with Berlin concerning the return of this property to its owners, citizens of the United States of America. The boxes were stamped by the police and were kept until an opportune time for sending them to the U.S. However, after the U.S. entered the War, the negotiations stopped, and after the War ceased the negotiations were resumed (the lawyer working on this as agent for the aforementioned Rabbis and Agudas Chasidei Chabad is noted at the foot of this letter).

In order that the State Department should work energetically to locate these manuscripts and books in order to return them to their owners, the State Department needs to understand that these manuscripts and books are great religious treasures, a possession of the nation, which have historical and scientific value.

Therefore, I turn to you with a great request, that as a renowned authority on

movement's schools], together with the Rebbe, about which for various reasons discussion was curtailed, I now, at the request of the Rebbe, begin to discuss the matter again, to bring it to fruition. However, it has been determined that the purchase should necessarily be in the name of Agudas Chabad of American for understood reasons."

Asked to explain these understood reasons at trial, one witness stated:

"We understand it because we need that to be protected by the government of the United States, to be behind a major power, that the house would be protected."

That the establishment of these legal forms had such a motivation does not make them any less real or legally binding.

Following the acquisition of 770 Eastern Parkway by plaintiff, the property was mortgaged to the Rebbe, thus giving the Rebbe and his heirs a formal legally binding claim on the building of which his heirs thereafter availed themselves. Tax exemption was obtained from the State of New York for those portions of the building that remained in the possession of plaintiff and where the library was located following its delivery to the United States. All of these circumstances tend to support the finding expressed in these pages that the Rebbe delivered the library into plaintiff's hands on the express understanding that it be held by plaintiff subject to legally enforceable fiduciary obligations for the benefit of the religious community of which the Rebbe was the leader.

the subject, you should please write a letter to the State Department to testify on the great value of these manuscripts and books for the Jewish people in general and particularly for the Jewish community of the United States to whom this great possession belongs."

Defendants seek to explain this letter as duplicitous and of a piece with the wartime letters in German intended to be read by the Nazi censor. For reasons to be discussed more at length hereinafter, the explanation must be rejected. Suffice it to note at this point that there is no reason to suppose that the Rebbe contemplated that the contents of the letter would fall into the hands of what defendants characterize as anti-semitic, post-war communist regime in Poland, which in their view had to be deceived as to the ownership of the library. On the contrary, it was addressed to the librarian of the Jewish Theological Seminary in New York, the then largest Judaica collection in the world. Not only does the letter, even in translation, ring with feeling and sincerity, it does not make much sense that a man of the character of the Sixth Rebbe would, in the circumstances, mean something different than what he says, that the library was to be delivered to plaintiff for the benefit of the community.

Post-war dealings with the library, which thereafter was in fact delivered to plaintiff to be housed in 770 Eastern Parkway, make clear that ownership of the library by plaintiff for the benefit of the community necessitated by wartime events was nonetheless real because of the circumstances under which it came about. Purchases for the library were made in the name of plaintiff, and payments for books purchased were made from its accounts both before and after the death of the Sixth Rebbe in 1950.[8] These include purchases not only from booksellers around the world but, of particular significance, purchases from Jewish Cultural Reconstruction, Inc., an entity created, *inter alia*, to distribute unclaimed Judaica recovered from the holocaust to institutional libraries under the supervision of Dr. Hannah Arendt and a written stipulation that "all books will be treated as part of the cultural heritage of European Jewry" and that "[n]o material received may be sold."

The treatment of the library at the time of Rabbi Joseph Isaac Schneersohn's death supports the conclusion that the library was no longer considered by him or by those familiar with his thought on the matter as his personal property. Despite a family history of disputes concerning the transmission of the *ksovim* and *seforim* from generation to generation of Rebbes, the Sixth Rebbe left no will. The Rebbe's estate, after some initial uncertainty, was closed without listing the library as an asset, despite its recognized value. The widow and each of the Rebbe's two daughters, including the defendant Hanna Gourary, signed releases reciting that they had received what they were entitled to under the estate without taking possession of the library. Not until twenty years after the Rebbe's death did his widow evidence a view that the library was hers as an inheritance from her husband in a letter stating that her two daughters should divide the library as well as the building at 770 Eastern Parkway, a building which is undisputably owned by plaintiff. In the 1970's upon discovery of an additional 25 crates

---

**8.** Defendants have made an application to strike all evidence relating to these payments between 1948 and 1952 on the ground that accounting records of plaintiff with respect to them were not disclosed in pretrial discovery. The application is denied. Defendants' discovery requests, as they themselves characterize them, sought discovery of all documents on which plaintiff intended to rely in support of its case. Plaintiff's delay in producing these documents is plausibly explained by it as a result of a failure to appreciate their significance, an explanation which the Court accepts, given the haste of trial preparation and plaintiff's rather unfocused approach to the issues in this case. (In plaintiff's view, the Sixth Rebbe's library was never his personal property, and the events following the delivery of the library to it following the war are of no particular significance.) In all events, defendants have shown no prejudice from the delayed disclosure. The accounting records are of the most elementary sort and clearly show the expenditure of at least $2,200 by plaintiff to acquire books for the library in the period 1948 through 1952.

from the library in Warsaw, the Rebbe's daughters conveyed their interest in that property as heirs and surviving children of the Sixth Rebbe to an affiliate of plaintiff without consideration.[9]  The conclusion is inescapable that the library was not held by the Sixth Rebbe at his death as his personal property, but had been delivered to plaintiff to be held in trust for the benefit of the religious community of Chabad Chasidism.

## DISCUSSION

What is at issue is whether the Rebbe divested himself of private ownership of the library at some time prior to his death by making it the *res* of a charitable trust for the benefit of the Lubavitch community.  There is little dispute between the parties as to the applicable law.  To create a charitable trust, the settlor must (1) describe with definiteness a charitable purpose, (2) name the group of beneficiaries, either definite or indefinite, and (3) either deliver the trust property to the trustee with an intent expressed clearly and unequivocally by words or actions to create a trust or declare through clear and unequivocal words or acts that he holds the property in trust.  G. Bogert, *The Laws of Trusts and Trustees*, § 232 (Rev.2d ed. 1977); 4 A. Scott, *The Law of Trusts*, § 348 (3d ed. 1967).

There is also little dispute concerning the factual support necessary to establish the first two elements of this required showing.  Both sides are in apparent agreement that the Sixth Rebbe throughout his life looked upon the library as both a research library to be used by scholars and as a repository for those treasures of Chabad Chasidism constituting the *ksovim* required for the leader of the movement to serve the group's religious needs—both indisputably appropriate charitable purposes.  More-

over, there can be little dispute that the Sixth Rebbe, like his predecessors, regarded the community of Chabad Chasidim as the beneficiaries of these activities, directly in the case of the Rebbe's use of the *ksovim* and indirectly through the prestige created by the existence of such a library with respect to the *seforim*.  What is in dispute between the parties is whether at some point in his life the Rebbe, unlike his predecessors, gave up personal ownership and control over the library and delivered it to trustees with the stated intent that it be held by them in trust, subject to their being called to legal account, for the benefit of the community, and for the charitable purposes outlined above.

Much of the dispute arises because of strained and implausible arguments made on plaintiff's behalf seeking to establish such propositions as that the library was an outright gift by the Sixth Rebbe to plaintiff without charitable intent or the imposition of trust obligations in consideration for Agudas Chabad's expenditures in securing the Rebbe's escape from Europe and paying his debts.  There is little evidence to support such an interpretation of the facts in this record and much which refutes it.

So, too, the argument of plaintiff that *ma'amad* was given to the Rebbe in trust to acquire a library to be held in trust is quite correctly refuted by, *inter alia*, defendants' quotation of a reply by one of Rabbi Joseph Isaac Schneersohn's secretaries, Rabbi Feigin in Warsaw, to a request from plaintiff's predecessor for an accounting of *ma'amad* funds:

> "[I]t is impossible that the secretary of Agudas Chabad can have a precise statement of the expenses of the Rebbe.  This can't be done because the man is from the outside.  Today he is in Agudas Cha-

**9.** Since these 25 crates of books did not arrive in the United States until after the Rebbe's death, they were never delivered to the plaintiff to be held by it in trust.  *Cf. In re Estate of Fontanella,* 33 A.D.2d 29, 304 N.Y.S.2d 829 (3d Dep't 1969).  As a consequence, the 25 crates remained property of the Rebbe during his lifetime and formed part of this estate at the time of his death.  *In re Solot's Estate,* 50 N.Y.S.2d

401 (Sur.Ct. Kings Co. 1944), *aff'd,* 269 A.D. 759, 55 N.Y.S.2d 125 (1945).  In the circumstances, it is understandable that the present Rebbe's representatives sought a formal renunciation from the Sixth Rebbe's heirs of their interest in the books.  That the heirs gave it speaks forcefully in support of the clarity of the Sixth Rebbe's intentions with respect to the library.

bad, and tomorrow he may be out in the street. You must yourself be very careful that he should not know everything."

*Ma'amad* monies were given to the Sixth Rebbe with the same lack of restriction on their disposition that is said to have characterized gifts to another church leader whose conviction for tax evasion was recently upheld by the Court of Appeals for this Circuit. *United States v. Moon*, 718 F.2d 1210 (2d Cir.1983), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984).

However, defendants' efforts to expand their argument, based on the patent readiness of the Rebbe's followers to permit him to do what he pleased with their money, into a more general proposition that no trust relationship can ever exist within the Chasidic movement must be rejected.[10] As the foregoing account of the library's history demonstrates, the Rebbe's establishment of a legally enforceable relationship behind plaintiff, the Rebbe's followers, and the library comes about not as a result of the demands of his followers but as a result of a need to articulate for the benefit of others the precise nature of the relationship between the library and the Chabad Chasidic community.[11] The fact that Agudas Chabad formally assumed legally enforceable duties with regard to the library as a result of the Rebbe's need to avail himself of the assistance of the United States Government in getting the books out of Poland explains why a trust was created, not that the relationship created was something other than what it appears to be. It is, of course, understandable that before the United States Government would stir itself to assist an individual purporting to be the leader of a large religious community that it would expect a showing that the religious community and not the leader would be the beneficiary of its efforts.

Which brings us back to defendants' argument that the Sixth Rebbe's letter to Dr. Alexander Marx is a lie. Without lengthening this opinion with a discussion of ample evidence that demonstrates that lies are as roundly condemned by the Jewish religion as by most others,[12] the question bears asking what the truth is supposed to

10. Defendants err in assuming that, because of the Rebbe's autocratic relationship with his followers, he would never permit himself or the institutions he oversaw to be bound by legally enforceable duties. The record is quite clear that he did just that on a number of occasions. The reasons for this seeming paradox are not difficult to find. For one thing, the acceptance of legal duties, *vis à vis* his followers, enforceable at the instance of legal authorities outside the Chabad community, became a necessity imposed on the Rebbe, not by his followers, but by the events of the mid-twentieth century. Secondly, the Rebbe's authority over his followers and his devotion to them made the distinction between legal and moral obligation an easy one for all to live with. Thus, the community did not hesitate to grant the Rebbe and his family the modification of legal rights represented by the mortgage of 770 Eastern Parkway in the Rebbe's favor in order to afford him some personal security. And the Rebbe did not, I find, hesitate to convey his valuable library to be held in trust for the community when the events or World War II and its aftermath made that step advisable for the community's welfare.

11. It is significant that in the same period of time from 1940 through 1946 in which the Sixth Rebbe is articulating the nature of Agudas Chabad and its officers' interest in the library to Marx presumably for transmittal to the United States Government, he was regularizing his position with the State of New York by seeing to the acquisition of his residence at 770 Eastern Parkway in the name of Agudas Chabad with a mortgage on the property in his favor and a tax exemption for those portions of the building used for charitable purposes, including, incidentally, the portion housing the library.

12. The difficulty of arguing that the Rebbe lied in his letter to Marx is eloquently expressed in the outburst by Rabbi Liberman, once his assistant, now a distinct partisan of defendants' cause:

"It was the only way under the circumstances that he could have done it, and there is no way you're going to call this a lie, *haas v'sholom* [God forbid]. The Rebbe didn't say any lies. How does your tongue allow you to use the word? The Rebbe lied? The Rebbe said it belongs to Agudas Chabad. That makes it a lie? The Rebbe didn't lie. There was no other way to get the *seforim* out. It had to be done that way."

What the record makes poignantly clear is the drastic change in the Rebbe's affairs brought about by World War II and his rigorously honest acceptance of the realities which those events forced him to recognize.

be that the lie was intended to conceal. For the fact of the matter is that the library was never held by the Rebbe as personal property for his personal benefit and his private, as opposed to religious, purposes. It was held as personal property for the community's benefit and for charitable uses. What the letter to Marx and the other manifestations of intent to the Government of the United States both before and after the war supply is what the law requires for the creation of a trust, that is, evidence sufficient to persuade the undersigned beyond a reasonable doubt that the Rebbe delivered his library to representatives of plaintiff with a clear and unequivocal "manifestation of an intention to create it ... subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose." 4 A. Scott, *The Law of Trusts*, § 348 at 2768 (3d ed. 1967), *quoting Restatement* (Second) of Trusts.[13] Of course, the Marx letter is not itself a trust instrument, but it is evidence of the strongest sort, taken together with the way the library was treated after its arrival in the United States, that upon its arrival in this country it was delivered into the custody of Agudas Chabad with an express declaration that it was to be held by that corporation in trust for the benefit of the Chabad Chasidic community. That the Sixth Rebbe's actions solved the collateral problem that had plagued his predecessors of transmitting the tools of the Rebbe's trade from one generation of the next was an incidental effect of his clarification of his relationship to the library and of its relationship to the community and its institutions. It is, however, the key issue in this lawsuit and must be resolved in favor of the plaintiff.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.

13. Defendants make much of the reference in the Marx letter to the wartime officers of Agudas Chabad as the "registered" or "official" owners of the library, recalling evidence of a practice in 19th Century Russia of registering property in the names of Gentiles to avoid legal proscriptions on property ownership by Jews. The analogy is not far-fetched but it does not answer the question, if Agudas Chabad is only the legal owner, who the real or beneficial owner is. The letter to Marx makes that patently clear. It is "the Jewish people in general and particularly the Jewish community of the United States to whom this great possession belongs." Moreover, the concept of registration of property, like the conveyance of 770 Eastern Parkway to Agudas Chabad, involves a recognition of legal obligations on the part of the legal owner enforceable in a court of law, and that is all the law of trusts requires.