**AGUDAS CHASIDEI CHABAD OF UNITED STATES,**
Plaintiff–Appellee,

v.

**Barry GOURARY, Defendant–Appellant,**

Hanna Gourary,
Intervenor–Defendant–Appellant.

No. 1302, Docket 87–7224.

United States Court of Appeals,
Second Circuit.

Argued June 25, 1987.

Decided Nov. 17, 1987.

Richard A. Jaffe, New York City (Matthew G. Dineen, Catherine A. Helwig, Abady & Jaffe, New York City, of counsel), for defendant-appellant.

Nathan Lewin, Washington, D.C., Jerome J. Shestack, Philadelphia, Pa. (Martin D. Minsker, Miller, Cassidy, Larroca & Lewin, Washington, D.C., Gayle C. Sproul, Schnader, Harrison, Sedal & Lewis, Philadelphia, Pa., of counsel), for plaintiff-appellee.

Before VAN GRAAFEILAND, CARDAMONE, and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

In this appeal from a partial final judgment and order of the United States District Court for the Eastern District of New York (Sifton, J.), we review the district court's rulings that granted appellee replevin in an action to recover books taken from its library and that dismissed appellants' counterclaim seeking a declaration that the library was theirs by right of inheritance. The district court's opinion is reported at 650 F.Supp. 1463 (E.D.N.Y. 1987).

The precise question before us is whether the evidence before the district court was sufficient to demonstrate a settlor's unequivocal intent to convey the library in question to appellee as trustee for charitable purposes. We acknowledge that some of the evidence is, standing alone, equivocal. But, as is often the case, a person's actions sometimes speak even more plainly than his words. Such is the case here. When the settlor's actions and words are viewed as a whole, the district court's finding of an unequivocal intent to create a charitable trust—far from being clearly erroneous—is in our view rightly decided. Hence, we affirm.

## I  Background

At issue is the ownership of a 40–50,000 volume library consisting of sacred manuscripts and a variety of religious books. Plaintiff-appellee, Agudas Chasidei Chabad of the United States (Agudas Chabad), is a New York religious corporation with offices at 770 Eastern Parkway, Brooklyn, New York. Defendants-appellants, Hanna Gourary and Barry S. Gourary, are mother and son. Mrs. Gourary is the daughter of Rabbi Joseph Isaac Schneersohn and Barry S. Gourary is the Rabbi's grandson. Until his death in 1950, Rabbi Schneersohn was the sixth in a line of leaders of the Chasidim movement known as Chabad Chasidism, founded in 1775 in Eastern Europe and later called Lubavitch Chasidism. The library is housed on the premises of plaintiff's synagogue and headquarters at 770 Eastern Parkway, which also served during his lifetime as Rabbi Schneersohn's home.

For purposes of discussion the library may be divided into two parts, the *ksovim* ("writings") and *seforim* ("books"). The *ksovim* are statements of the Lubavitcher Rebbes, generally handwritten by the Rebbes themselves and passed down from one Rebbe to the next. Found in these writings are the basic tenets of the Chasidic beliefs, and the *ksovim* serve as a source for a Rebbe's discourses to the community. These sacred writings have always been preserved by the Rebbes, whatever the cost. The bulk of the library consists of the *seforim*, presently around 40,000 texts. Commencing in the 1920's, Rabbi Schneersohn, as the Sixth Lubavitcher Rebbe, acquired the bulk of the *seforim* during his lifetime, with the remainder being collected by others after his death. Some books were obtained by purchases, employing funds collected as contributions from the community known as *ma'amad*, used to support the Rebbe and his immediate family and to support community activities—including the library—that the Rebbe oversees. Other parts of the *seforim* were acquired as gifts from authors and publishers in response to advertisements soliciting books for the Lubavitcher library.

At least from the time of the Third Rebbe, it was the practice of each Lubavitcher Rebbe to maintain and add to a large library of books and manuscripts. Although the district court stated that each of the Rebbes treated the library as personal property, it also found that there can be "no question that the library came to be conceived as one to be used for the benefit of the religious community of Chasidim by the leader of the community, the Rebbe." 650 F.Supp. at 1466.

For 35 years, from the time of Rabbi Schneersohn's death in 1950 until 1985, the library remained intact in the plaintiff's possession without anyone disputing plaintiff's ownership of it. In the summer of 1985 the defendant, Barry S. Gourary, surreptitiously removed over 400 rare books

from the library and sold some of them to book dealers in various parts of the world. He realized approximately $186,000 from the sale. Defendant's actions in secreting these books from the library were discovered by video surveillance and caused the present action to be instituted.

Alleging ownership of the books Gourary had removed, Agudas Chabad commenced this diversity action against Barry Gourary, a New Jersey resident, in the Eastern District of New York, asserting claims for replevin, conversion, and trespass in order to recover the value of the books defendant had sold and the return of the others in his possession. A motion to intervene as a party defendant made by Hanna Gourary was granted, and the two Gourarys then instituted a counterclaim for a judgment declaring that the library housed at 770 Eastern Parkway belonged to them by reason of inheritance.

A bench trial on Agudas Chabad's replevin claim and the Gourarys' counterclaim was held in December 1985. Judge Sifton wrote a published opinion dated January 6, 1987 and a subsequent unpublished memorandum and order entered March 9, 1987. The district court judge granted partial final judgment dismissing the Gourarys' counterclaim and granting plaintiff relief in its replevin action. The district judge determined that the library was not part of the estate of Rabbi Schneersohn at the time of his death because during his lifetime he had made it the subject of a charitable trust. It therefore ordered Barry Gourary to deliver the books in his possession to Agudas Chabad, but stayed execution of the judgment pending appeal.[1]

On appeal, appellants argue that the district court erroneously found that the Rebbe intended to create a charitable trust and, further, that they were entitled to a jury trial. We discuss these issues in turn.

## II *Law of Charitable Trusts*

■ This diversity action is governed by New York law. To create a valid trust

---

1. At present, the *ksovim* and most of the 40,000 volumes of the *seforim* remain at 770 Eastern Parkway. Of the 400 books removed by Barry Gourary, those not sold are in depositories in New Jersey under the joint custody of attorneys representing Agudas Chabad and the Gourarys. Several books which the Rebbe kept on or near his desk in his study remain in Barry Gourary's possession.

under the law of that State four essential elements must be proved: (1) a designated beneficiary, (2) a designated trustee, who is not the same person as the beneficiary, (3) a clearly identifiable res, and (4) the delivery of the res by the settlor to the trustee with the intent of vesting legal title in the trustee. *Brown v. Spohr*, 180 N.Y. 201, 209, 73 N.E. 14 (1904).

A trust may be created orally or in writing, and no particular form of words is necessary. *Martin v. Funk*, 75 N.Y. 134, 141 (1878). Further, a trust may emerge by implication "from the acts or words of the person creating it," *Wadd v. Hazelton*, 137 N.Y. 215, 219, 33 N.E. 143 (1893), so long as the intent to create such an implied trust arises as a necessary inference from unequivocal evidence. *Id.* Stated another way, to constitute a trust there must be either an "explicit declaration of trust, or circumstances which show beyond reasonable doubt that a trust was intended to be created." *Beaver v. Beaver*, 117 N.Y. 421, 428, 22 N.E. 940 (1889); *see also Martin v. Funk*, 75 N.Y. at 141 (words or acts demonstrating that person holds property in trust must be unequivocal); *In re Estate of Fontanella*, 33 A.D.2d 29, 30, 304 N.Y.S.2d 829 (3rd Dep't 1969) (same).

These long-standing rules apply equally to charitable trusts. *See Lefkowitz v. Cornell Univ.*, 35 A.D.2d 166, 172–73, 316 N.Y.S.2d 264 (4th Dep't 1970), *aff'd*, 28 N.Y.2d 876, 322 N.Y.S.2d 717, 271 N.E.2d 552 (1971). Although appellants challenge the district court's view of New York law, we believe it relied upon the proper standards. *See* 650 F.Supp. at 1474.

### III *Analysis of the Evidence*

The more difficult proposition—and the principal focus of appellants' argument—is whether the evidence supports a finding that a charitable trust was created under New York law. Appellants maintain that any representations to the effect that the library did not belong to the Rebbe were made not to effect a change in ownership, but rather to gain the assistance of the United States during World War II in transporting the library from Poland to the United States, since the government would not intervene to help save a foreigner's personal property. We first examine the evidence and then apply to it the recited New York standard.

We begin analysis of the evidence of the Rebbe's intent to create a charitable trust by reviewing (1) the circumstances under which the library was collected, (2) Rabbi Schneersohn's written declarations concerning the library, (3) appellants' claims regarding the library during the probate of Rabbi Schneersohn's estate, and (4) actions taken regarding the collection in the years following the Rebbe's death. Plainly, not all the evidence found in the above four subparts is direct proof of intent. But since the circumstantial and indirect evidence of the Rebbe's intent was properly considered by the district court—and bears heavily on that issue—we discuss it as well.

#### (1) *Library Collection*

The bulk of the present library, as already noted, was begun years ago in Europe. Many of the volumes were acquired by solicitation on behalf of the "Lubavitch Library", not on behalf of Rabbi Schneersohn personally. Experts testified at trial that under Jewish law this kind of solicitation made the library property of the community. The trial testimony further established that the activities of the Lubavitch Chasidic community in the pre-war years were financed principally by contributions from followers of the Lubavitch movement living in the United States, who had by that time become known as the Agudas Chasidei Chabad of the United States and Canada, plaintiff's predecessor. An expert on the Lubavitch Chasidic movement testified that these contributions—the *ma'amad* referred to earlier—are like the membership dues of a society to which the members are expected to contribute. These funds were used by Rabbi Schneersohn for support of community institutions, for the purchase of books for the library, and for the personal expenses of his household.

The library contains books of all sorts, including anti-religious and anti-Semitic books, and is not limited to rabbinic and

sacred writings. Testimony at the trial by the librarian and by experts indicated that a Chasidic Rebbe would not deliberately read—much less own—such books. Nobel Prize winner Elie Wiesel testified at the trial that it was contrary to Chasidic philosophy for a Rebbe to amass a personal fortune or to collect and display a valuable personal library. The librarian who was assigned to purchase volumes and to maintain the library stated that Rabbi Schneersohn planned to create "a library for researchers," comparable to the library of the Jewish Theological Seminary or to the British Museum.

In light of these views, it is implausible that Rabbi Schneersohn would have collected these many thousands of valuable and varied books as a private library. The district court viewed this evidence as proof of the "religious purpose for which the library was put together." 650 F.Supp. at 1467. We agree.

### (2) *Rabbi Schneersohn's Declarations*

On three occasions between 1939 and 1946 Rabbi Schneersohn explicitly declared in writing that the library belonged to the plaintiff Agudas Chabad. A brief word of background is helpful in placing these declarations in their proper context, and much of it is set forth in greater detail in Judge Sifton's thorough published opinion.

When Germany invaded Poland in September 1939 at the onset of the Second World War, Rabbi Schneersohn was forced to flee his home in Otwock and find refuge in Warsaw. Most of the library was left behind, though apparently some books were carried to Warsaw. On November 27, 1939 he wrote, in German, to his secretary and librarian, Haim Liberman, who was then in Riga:

> I have no apartment, and I find myself living with friends with my entire family in one room; consequently, I have no space for the books which Agudas Chabad loaned me for study. I would be pleased if Agudas Chabad were to take these books back.

Approximately one month later, after he too arrived in Riga, the Rebbe wrote a letter directly to New York in which he referred to the library that had been left behind in Otwock and in Warsaw. The letter noted that he had sent telegrams to the United States seeking to have the library transported to America and that his son-in-law, Rabbi Gourary, had discussed the matter on the telephone, but that nothing had been done. The library was described as packed in 120 cartons, located principally in Otwock. The New York officials of Agudas Chabad were asked to write or cable to the American Consul in Berlin to ask him to contact the American Consul in Warsaw

> that he should take the library of Agudas Chabad and of Rabbi Schneersohn—for I said that part of the library is the property of Agudas Chabad and part is mine.

And, referring to the manuscripts left behind in Warsaw, he added:

> Also three boxes of sacred manuscripts, which are the property of Agudas Chabad and should be sent straight to New York.

With the assistance of the United States government, the Rebbe was eventually able to escape from Nazi-occupied Poland and ultimately arrived safely in the United States in 1940, taking up residence at 770 Eastern Parkway, where he lived with his family for the rest of his life. It is evident from the record—and the parties do not dispute it—that a substantial portion of the library, some 90 boxes, arrived in the United States in 1941. Exactly how that portion of the library was retrieved is unclear from the record. A smaller portion of the library, some 25 crates, arrived in the United States from Warsaw in the 1970's, 20 years after the Rebbe's death. Earlier in our discussion we divided the library into *ksovim* and *seforim* for the sake of clarity. But we think the district court correctly treated the library as a single unit, if for no other reason than because the Rebbe and everyone else dealt with it as a single unit and, as Judge Sifton noted in his March 9 opinion, "having a single set of purposes, ownership and appropriate location."

A third explicit acknowledgment that plaintiff Agudas Chabad was given legal

title to the library was made on February 25, 1946, just after the war ended, in a letter from Rabbi Schneersohn to Dr. Alexander Marx, the librarian of the Jewish Theological Seminary. In that letter Rabbi Schneersohn advised Dr. Marx that a part of the library still remained in Europe. The Nazis had seized three large boxes of manuscripts that "are registered under the names of the Rabbis, members of Agudas Chasidei Chabad, Rabbi Israel Jacobson, and his son-in-law, Rabbi Shlomo Zalman Hecht, both American citizens (who are) the official owners of this property." Rabbi Schneersohn went on to describe the books that were still missing: "Books: Several thousand books, among them many ancient books of great value and very rare. These books are the property of Agudas Chasidei Chabad of America and Canada." Rabbi Schneersohn's letter closed with two paragraphs which reinforced the proposition that the library was no longer his personal possession:

In order that the State Department should work energetically to locate these manuscripts and books in order to return them to their owners, the State Department needs to understand that these manuscripts and books are great religious treasures, a possession of the nation, which have historical and scientific value.

Therefore, I turn to you with a great request, that as a renowned authority on the subject, you should please write a letter to the State Department to testify on the great value of these manuscripts and books for the Jewish people in general and particularly for the Jewish community of the United States to whom this great possession belongs.

Based on this reference to the United States State Department, appellants claim that the Rebbe's only purpose was to gain the government's assistance. In effect, they claim the Rebbe wrote the letter in a disingenuous—even dishonest—manner to secure the library's safety; in appellants' view the Rebbe's final line in the letter regarding the Jewish community as the rightful possessors of the library was hyperbole used only for an ulterior motive.

We cannot agree. It simply defies reason and common sense to believe that a religious leader of the Rebbe's stature, whose life was dedicated to expounding the spiritual values of truth and morality, would deliberately write letters containing misrepresentations regarding the ownership of a valued and to him sacred national treasure in order to feather his own nest.

Instead, the district court correctly found that this letter flatly stated that plaintiff Agudas Chabad is the owner as trustee of the library turned over to it by Rabbi Schneersohn with the intent that this "great possession" be administered for the Jewish community of the United States.

### (3) *Rabbi Schneersohn's Estate*

Rabbi Schneersohn died in 1950 without leaving a will. His widow took out letters of administration, and his estate was closed in 1958. The library was not included in the estate. Each of Rabbi Schneersohn's two daughters, including the appellant Hanna Gourary, executed a sworn "fiduciary release" declaring that she had received "everything due me from said Estate". Although each daughter received some items of personal property, the record contains no evidence that either daughter received any books. Nor was the library included in Rabbi Schneersohn's widow's estate when she died intestate in 1970.

The evidence further reveals that in the years following the Rebbe's death, neither defendant Hanna Gourary nor her mother ever acted as though they believed the library was theirs. His widow never went to the library or asked about its condition. Nor did Hanna Gourary. Neither contributed to its maintenance. Again, while this evidence is indirect and circumstantial, it would be unreasonable to conclude that the Rebbe's wife and daughter—the objects of his closest affection—would be unaware of his disposition of so valuable an asset as the library. Their actions toward this collection strongly suggest that he must have told them during his lifetime that he no longer had an ownership interest in the library that they could claim at his death.

*(4) Events Following the Rebbe's Death*

Moreover, the acquisition of books for the library did not cease with Rabbi Schneersohn's death, as might be expected were it his personal library. The records received at trial establish that purchases and payments were made after January 1950, just as they had been previously. Correspondence demonstrates that booksellers continued to sell books to the library for many years after the Rebbe's death. In addition, books purchased on a number of occasions before and after his death from the Jewish Cultural Reconstruction, Inc., were obtained on condition that they never be sold. Nominal payments for these books were made by plaintiff Agudas Chabad.

In sum, the cataclysmic events of World War II irretrievably altered the prior informal relationship that had existed between the Rebbe and the community he served. In particular, it became necessary to formalize that association with respect to the shared personal and real property because, first, the war caused the Rebbe to come to the United States while leaving the library behind in Europe. Second, 770 Eastern Parkway, Brooklyn, New York, which became the depository of the library when much of it arrived in 1941, also was the headquarters of Agudas Chabad and the Rebbe's home. Judge Sifton observed that as its leader the Rebbe then felt a "need to articulate" and define the association between himself and the community he served and the real and personal property that they shared. 650 F.Supp. at 1475.

Thus, for example, a tax exemption was obtained for that portion of the premises at 770 Eastern Parkway devoted to charitable purposes, and the exemption included that part of those premises that housed the library. At about the time that the Rebbe declared that the library belonged to the plaintiff as trustee to be used for the benefit of the community, title to the 770 Eastern Parkway property was conveyed to plaintiff Agudas Chabad with a mortgage in the Rebbe's favor. This, as the district court noted, afforded the Rebbe a feeling of personal and legal security in his home, one that, significantly, the Rebbe's heirs benefited from following his death.

Examining this evidence in light of the governing law, it is plain to us—as it was to the district court as well—that under New York law a trust arose beyond a reasonable doubt. We think the district court, which had the benefit of hearing the numerous witnesses in this voluminous record, fairly and equitably resolved the issue of intent stating that upon the library's "arrival in this country it was delivered into the custody of Agudas Chabad with an express declaration that it was to be held by that corporation in trust for the benefit of the Chabad Chasidic Community." 650 F.Supp. at 1476. The trial court further concluded that there was "evidence sufficient to persuade [it] beyond a reasonable doubt that the Rebbe delivered his library to representatives of plaintiff with a clear and unequivocal" intent to create a trust, subjecting the plaintiff corporation to the duty of administering the library for charitable purposes. *Id.* Because the circumstances surrounding the manner in which the library was assembled, the actions of Rabbi Schneersohn's heirs, and the events following the Rebbe's death fully support the express declarations he made during his lifetime, we conclude that the district court's finding beyond a reasonable doubt of Rabbi Schneersohn's unequivocal intent to convey the library to plaintiff as trustee for charitable purposes was not clearly erroneous.

### IV  *Jury Trial Issue*

■ Appellants further claim on appeal that they were improperly denied their right to trial by jury. We believe that under the circumstances of this case, the district court properly first conducted a bench trial of the equitable issues presented.

Fed.R.Civ.P. 38(a) states that "[t]he right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate." As the Supreme Court has held, where both legal and equitable claims are advanced, the

right to trial by jury may not be lost by determining the equitable claims first. *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 472–73, 82 S.Ct. 894, 897, 8 L.Ed.2d 44 (1962); *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 510–11, 79 S.Ct. 948, 956–57, 3 L.Ed.2d 988 (1959). Yet, *Dairy Queen* itself recognized that under certain circumstances an equitable claim may sometimes be tried first even though such trial decides the legal issues also pleaded. 369 U.S. at 473, 82 S.Ct. at 897. These circumstances have been found, for example, when a bankruptcy court adjudicates equitable claims before legal ones, though the latter if tried earlier would have been entitled to be tried by a jury. *Katchen v. Landy,* 382 U.S. 323, 339–40, 86 S.Ct. 467, 478, 15 L.Ed. 2d 391 (1966). Thus, in *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Court explained that *Beacon Theatres* "enunciated no more than a general prudential rule...." *id.* at 334, 99 S.Ct. at 653, and it again recognized that there are circumstances when equitable claims may be resolved before legal ones, *id.* at 334–35, 99 S.Ct. at 653. We think that the facts of the instant case furnish just such circumstances.

Only defendant Barry Gourary was charged with wrongdoing in the legal causes of action for replevin, trespass, and conversion. The complaint containing those causes of action was filed on August 5, 1985. Barry Gourary filed an answer to the complaint on August 23, and on September 13 filed an answer and amended counterclaim. Therefore, his demand for trial by jury filed on October 2, 1985 was, as the district court found, not timely. *See* Fed.R.Civ.P. 38(b), (d). Since the legal issues of conversion, trespass, and replevin did not concern Hanna Gourary—even had her son's jury demand been timely made— she was not entitled reasonably to rely upon his demand. *See Rosen v. Dick,* 639 F.2d 82, 92 (2d Cir.1980).

In fact, her presence in the case as an intervening party joining with Barry Gourary in the answer and amended counterclaim of September 13 and filing, through the same attorneys that represent her son, her own answer and counterclaim dated

September 23 added nothing to the issues already before the district court, except perhaps to provide an opportunity to demand a jury trial that Barry Gourary had waived by not claiming the right in time. Despite this, she demanded a jury trial on all issues. But Mrs. Gourary had no right to a jury trial on her declaratory judgment counterclaim, which involved the existence vel non of a trust, and which sought injunctive relief.

Consequently, under these particular circumstances, we do not think that the district court abused its discretion in trying the equitable issues first. *See United States v. Massachusetts Bonding & Ins. Co.,* 303 F.2d 823, 829 (2d Cir.), *cert. denied,* 371 U.S. 942, 83 S.Ct. 317, 9 L.Ed.2d 276 (1962). Moreover, in light of our conclusion that Judge Sifton rightly found that Rabbi Schneersohn's intent to create a charitable trust had been proven beyond a reasonable doubt, it is evident that no useful purpose would be served by remanding the case for a trial by jury. *See King v. United Benefit Fire Ins. Co.,* 377 F.2d 728, 731 (10th Cir.), *cert. denied,* 389 U.S. 857, 88 S.Ct. 99, 19 L.Ed.2d 124 (1967).

## V Conclusion

Accordingly, the appeals from the partial final judgment dated January 6, 1987 and from the order entered March 9, 1987 denying appellants' motion to reopen and to amend the district court's findings and conclusions are affirmed.

Judgment and order affirmed.