**Rosa Maria CABALLERO, Plaintiff,**

v.

**Reynold V. ANSELMO, Julian M. Kaufman, Defendants.**

**No. 85 Civ. 2386 (IBC).**

United States District Court,
S.D. New York.

Sept. 7, 1989.

Curtis, Mallet–Prevost, Colt & Mosle, New York City, for plaintiff; Joseph F. Kelly, Jr., of counsel.

Lowenthal, Landau, Fischer & Ziegler, P.C., New York City, for defendant Reynold V. Anselmo; Lawrence L. Ginsburg, of counsel.

Hess, Segall, Guterman, Peltz, Steiner & Barovick, New York City, for defendant Kaufman; Alan Marder, of counsel.

IRVING BEN COOPER, District Judge.

Plaintiff Rosa Maria Caballero commenced this action March 27, 1985 to recover four thousand five hundred and forty-six shares (4,546) of stock ("the shares") in Spanish International Communications Corporation which she alleges were improperly sold by defendant Reynold V. Anselmo ("Anselmo") to defendant Julian M. Kaufman ("Kaufman"). Both Anselmo and Kaufman were directors and shareholders of SICC at the time of the alleged improper sale.

Plaintiff asserts three claims against defendant Anselmo individually. First, she claims that Anselmo converted the shares by selling them to Kaufman without au-

thority. For her second and third claims, plaintiff alleges that should the Court find that a trust relationship existed between Anselmo as trustee and plaintiff as beneficiary, Anselmo breached his fiduciary duty in two ways: by selling plaintiff's stock despite his limitation as trustee to merely vote the shares, and by acting in his own self-interest rather than the interests of the beneficiary. In a separate claim against defendant Kaufman individually, plaintiff alleges that the latter conspired with Anselmo to participate in the improper sale of the shares. Finally, plaintiff contends that both defendants wrongfully conspired to deprive plaintiff of her shares and breached their fiduciary duties as officers and directors of SICC by failing to act in the best interests of plaintiff, a shareholder, and by selling her shares for their own benefit.

Defendants deny plaintiff's allegations. Anselmo maintains that plaintiff's father appointed him trustee of the shares and that the sale of the stock to Kaufman was a permissible exercise of his power as trustee and a prudent decision under the circumstances. Kaufman asserts first that he believed Anselmo was authorized to sell the shares, and second that he received no financial benefit from the sale, as he was merely acting as a conduit for the sale of the shares to a third party, Daniel Villaneuva.

The action was tried before this Court on April 14, 15, and 16, 1986 solely on the issue of liability. At the close of plaintiff's case, defendant Kaufman moved for a directed verdict pursuant to Federal Rule of Civil Procedure 50, and defendant Anselmo moved to dismiss pursuant to Federal Rule of Civil Procedure 41(b). We reserved decision on both motions. We base our opinion upon the findings of fact and conclusions of law hereinbelow.

1. The letters "Tr." followed by a number indicates pages of the official trial transcript.

2. The letters "S.F." followed by a number indicate references to the stipulated facts contained in the parties' joint pre-trial order.

## FINDINGS OF FACT

Plaintiff Rosa Maria Caballero, twenty four years old at the present time, is the daughter of Eduardo and Raquel Caballero. (Complaint, para. 13) Mr. Caballero ("Caballero") and his wife were lawyers in their native Cuba, specializing in, *inter alia,* commercial contracts, divorces, and wills. (Tr. 37–38)[1] They emigrated from Cuba to the United States in October of 1961 (Tr. 39) and became United States citizens in 1976. (S.F. 12)[2] Soon after arriving in the United States, the Caballeros moved to New York, and in 1962 Caballero accepted an employment position with a Spanish language radio station (S.F. 13) selling air time to potential advertisers. (Tr. 40–41)

In April of 1968 Caballero was General Manager of the radio station. (S.F. 13) At that time, he was contacted by a secretary to defendant Anselmo, a principal officer (Ex. 1)[3] and director (Tr. 266) of the Spanish International Network ("SIN"), who inquired whether Caballero would be interested in talking to the latter about a job opportunity with a television station in New York City. (Tr. 42) Responding affirmatively, he met with Anselmo and was offered a position as a salesman with SIN (Tr. 43), a company involved in the business of representing Spanish language television stations and selling commercial time to advertisers. (S.F. 15) In early 1969 Caballero was promoted to National Sales Manager of SIN (Tr. 45) and eventually became a vice-president of the corporation. (S.F. 17) He held that post until March of 1973, when he terminated his employment with SIN. (S.F. 31)

In 1970, Spanish International Communications Corporation ("SICC"), a closely held corporation involved in the development of Spanish language television in the United States, was founded. (Complaint, para. 5; S.F. 6) SICC was incorporated in Delaware (Ex. H–1); Anselmo was its principal officer and director. (S.F. 27) SICC ob-

3. The letters "Ex." followed by a number indicate exhibits received in evidence at trial.

tained a license from the Federal Communications Commission ("FCC") in 1971 for the operation of a television station, WLTV, in Miami, Florida. (Tr. 47) In his capacity as Sales Manager for SIN, Caballero became directly involved in sales to national and local advertisers for the new station. (Tr. 46–47, S.F. 19)

In August of 1971, about the time WLTV was going on the air, Anselmo offered and Caballero accepted the opportunity to purchase three percent of the common stock of SICC for a price of fifteen thousand dollars. (Tr. 47–48) Anselmo extended the offer to purchase stock in the newly founded SICC to Caballero (an SIN employee) because he considered him a good co-worker, and it was his policy to reward employees performance by affording them opportunities to own interests in the company. (Tr. 204) At approximately the same time as Caballero accepted the offer of stock, Anselmo gave Caballero a bonus of fifteen thousand dollars which the latter decided to use in order to purchase the shares. (Tr. 48)

After Caballero bought the SICC shares but before a certificate of stock ownership was issued to him (S.F. 23), he learned from Anselmo of a Federal Communications Commission ("FCC") regulation which limited to twenty percent ownership of stock by foreign citizens in entities holding broadcast licenses. (S.F. 22) Anselmo advised him that the regulation would be violated by Caballero's ownership of the shares, since foreign ownership of SICC, a broadcast licensee, would thereupon exceed the statutory maximum. (Tr. 49) As a direct result of this information, Caballero agreed with Anselmo that the stock should be registered in the name of the secretary of Caballero, Maria Safina, a United States citizen, until such time as Caballero decided what was to be done with the shares, (Tr. 50–51) and Ms. Safina agreed to the arrangement. (Tr. 50; 142) Subsequently, Caballero learned of Ms. Safina's impending marriage (Tr. 52), whereupon he and his wife decided to transfer the stock to their minor daughter, Rosa Maria Caballero, as security for her future. (Tr. 52, 126)

The parties dispute the motivation underlying this determination by the Caballeros. It was Anselmo's contention that the true intent of Caballero was to maintain ownership of the shares; (Tr. 213) that he attempted to do so by registering the shares in the name of his secretary, but when circumstances proved that choice unwise, he transferred them to his daughter. (Tr. 209–210) Thus, according to Anselmo, his concern was not with the security of his daughter, but rather with his own personal interests. (Tr. 213)

Caballero, on the other hand, contended that his daughter's security motivated his decision. (Tr. 52) Corroborating testimony for his position was provided by Mrs. Caballero. Both elaborated upon their poverty stricken pasts and their fears with respect to financial instability. (Tr. 126–127)

In the face of conflicting testimony of these parties, we adopt that of the Caballeros who both favorably impressed us with their candor and sincere demeanors as well as their uncontradicted statements at trial. In contrast, we find that the motives of Anselmo in terms of how he conducted his business were often much less than pure; furthermore, many of the statements he made during the course of the trial were inconsistent. (Tr. 289–299; 300–301; 258; 297; 308–309) In light of our findings regarding the credibility of the witnesses, we conclude that the reason the Caballeros transferred the stock to their daughter was to help insure her future security.

Caballero advised Anselmo that he wanted to give the shares to his daughter; he believed that as an American citizen her ownership would not violate the FCC limitation. (Tr. 55) Anselmo agreed that this was a good idea, advised Caballero that he would take care of the situation, (Tr. 55) and informed Ms. Safina of the decision. (Tr. 145)

The Caballeros assumed that since plaintiff was a minor, they would act as her guardians and vote her shares. (Tr. 56) However, several weeks after the determination to transfer the shares was made, Caballero learned in a conversation with

Anselmo that the FCC regulation forbade foreign voting control as well as ownership to exceed twenty percent. (Tr. 56) It was Caballero's testimony that he then suggested that Anselmo vote the stock on behalf of plaintiff, and Anselmo agreed. (Tr. 56–58)

Caballero insisted that he never used the word "trust" or "trustee" in conversations with Anselmo regarding his gift of the stock to his daughter (Tr. 58); indeed, he believed that in order to be effective, a trust had to be in writing. (Tr. 93) He concedes that on one occasion (after Anselmo had sold the shares to Kaufman) he wrote a letter to Anselmo referring to him as trustee and demanding the return of the stock. (Ex. 2) Caballero testified:

Q: Mr. Caballero, I direct your attention to the second paragraph of that letter in which you refer to Mr. Anselmo as the trustee of the shares. Do you see that?

A: Yes, I do.

Q: What did you mean by that?

A: When some filings with the FCC was ordered to SICC lawyers, Mr. Anselmo listed himself in that memorandum as a trustee for Rosa Maria Caballero stocks. When I saw that, I felt very well about it because, in my mind, based on Cuban law experience that I had, a trustee, based on our law, could not pledge, or sell or do anything with the stocks unless he went to Court and asked for the Court permission to pledge or sell any minor's property. So, when I saw that he had established himself as a trustee, my feeling was that he was putting more limitations on himself than what I could dream of. In any case, we had given him the assignment to vote the stocks, and then I refer in the letter to him as the trustee of the stocks under my assumption that he wouldn't be able to do anything without going to Court and requesting permission to pledge or sell the stocks.

Q: So you felt comfortable with that description Mr. Anselmo gave of himself?

A: That's correct.

Q: Did you ever describe him as a trustee prior to the sale?

A: I never did. (Tr. 80–81)

It was Caballero's contention that there were no further statements made with respect to Anselmo's control over the stock. (Tr. 58–59)

In short, it was the understanding of Caballero that the only right Anselmo had with respect to the shares was the right to vote them on behalf of plaintiff. (Tr. 80; 101)

Anselmo's perception of the relationship between he and plaintiff is diametrically opposite. Anselmo claims that during the course of his second conversation with Caballero concerning plaintiff's ownership of the shares, Caballero appointed him trustee, placing no restrictions on his actions regarding the shares. Anselmo testified:

Q: What was your understanding of your rights in the stock as trustee?

A: As trustee, they would be unlimited as though the stock were mine.

Q: Was it necessary that it be structured that way?

A: Yes.

Q: Why?

A: For FCC purposes so we don't infringe the 20 percent foreign ownership rule.

Q: Was it your understanding that the retention of right over that stock by Mr. Caballero would have violated that rule?

A: Yes, it would have.

Q: Was it your understanding that the retention of the right to determine the sale of that stock by Mr. or Mrs. Caballero would have violated that rule?

A: Yes, it would have.

Q: And that was your understanding?

A: Yes, it was.

(Tr. 212)

We find that although Anselmo may have believed is was legally requisite for him to serve as trustee, he never discussed his interpretation of the law with Caballero. Moreover, our review of the trial record convinces us that Caballero, who consequently saw no need for Anselmo to

play any role in the shares other than the person charged with their voting power and who understood a trust to be a formal, written agreement, did not at any time appoint Anselmo trustee of the stock.

In November of 1972, Caballero advised Anselmo that he intended to leave the employ of SIN. (Tr. 61) Anselmo tried to persuade Caballero to stay, telling him the company was growing and would be a strong force in the Spanish advertising business. Caballero initially agreed to stay. (Tr. 62)

The next month SICC began a series of mergers with other corporations, resulting in an adjustment of the percentage of ownership and number of shares of each SICC shareholder. Caballero's percentage of ownership became .509%, or four thousand five hundred and forty-six shares. (S.F. 30)

On January 22, 1973 SICC filed an ownership report with the FCC setting forth the names of the SICC shareholders as of December 31, 1972. (Ex. 13) The ownership report was the first filing by SICC which referred to plaintiff, and identified her as an SICC "stockholder" whose shares were to be "voted by Reynold V. Anselmo." (Tr. 308–310; Ex. 13) Norman Leventhal, SICC's counsel, prepared and filed the ownership report (Ex. 13) based on information provided to him by Anselmo. (Tr. 374–375) He testified at trial that the ownership report listing plaintiff as the owner of the shares of SICC stock was accurate. (Tr. 376)

On the same date as the ownership report was filed, Anselmo hypothecated (pledged as security) plaintiff's shares to secure a $3,200,000 loan arranged by Marine Midland Bank. (Tr. 316–317, Ex. 14) Neither plaintiff nor her parents were informed of the hypothecation. (Tr. 66–67, 312, 315)

On March 31, 1973, Caballero resigned from SIN. (Tr. 63) At the time of his resignation, Anselmo once again attempted to persuade Caballero to stay with the company. Caballero, however, informed Anselmo that his decision was final and that he wanted to "go and try on [his] own" (Tr.

63) and be independent. (Tr. 64–65) Anselmo advised Caballero that he would be willing to assist him in putting together a television station of his own and obtaining programming for that station until it "got off the ground," (Tr. 65) as long as it was not located in a geographical area that would compete with SIN or SICC. (Tr. 65) Caballero declined the offer both because he did not have the financial means to afford the legal fees and start-up costs for this type of venture, and since he believed that any sort of connection with SIN would not allow him the free and independent operation he sought. (Tr. 70–71) When he advised Anselmo that he would not accept the offer, Anselmo told him he was "sick," then left Caballero's office. (Tr. 70) They did not discuss plaintiff's shares in SICC at the time Caballero left the employ of SIN. (Tr. 99)

Shortly after Caballero's resignation, defendant Kaufman was advised by Anselmo that the latter wanted to sell certain shares of SICC stock to a shareholder of the corporation (Ex. A–2) named Daniel Villaneuva. (Tr. 332) Anselmo requested that the shares be registered in the name of defendant Kaufman, a fellow director and shareholder of SICC. (S.F. 32; Tr. 331) Kaufman was considered by the FCC to be part of a control group, and therefore his purchase of the shares would not necessitate the filing of a long form application to the FCC, an undertaking that would be time consuming and expensive. A direct sale of the shares to Daniel Villaneuva would have required the undesirable FCC filings. (Tr. 334) Kaufman agreed to the arrangement proposed by Anselmo. (Tr. 341)

On May 14, 1973, approximately six weeks after Caballero's resignation from SIN, Anselmo sold plaintiff's shares to Kaufman. (Tr. 72–73) The sale was financed by Villaneuva and did not economically impact Kaufman. (Tr. 341) Once again, neither plaintiff nor her parents were told about the sale until after it was effectuated, and then only when Caballero received a certified letter from Anselmo advising the Caballeros of the transaction together with a check in the amount of ten

thousand dollars. (Tr. 72; 77) Anselmo made no inquiries as to the fair market value of the shares at the time of sale (Tr. 329), nor did he inquire into plaintiff's financial circumstances prior thereto. (Tr. 324) Caballero responded immediately by letter to Anselmo rejecting the proceeds from the sale and demanding that the shares be returned to his daughter on the grounds that Anselmo had lacked authority to sell them. (Ex. 2) Anselmo refused to return the shares. (Tr. 81, 83) From January 1, 1973 to the date of trial, Anselmo sold no shares of SICC personally owned by him. (Tr. 359; S.F. 38)

Caballero contends that the motivation underlying Anselmo's decision to sell plaintiff's shares was anger at his ex-employee coupled with Anselmo's desire to ensure that the stock of his corporation not be owned by outsiders. Anselmo, on the other hand, argues that statistics indicating failing financial health for SICC caused him to sell plaintiff's stock. (Ex. I–S; Tr. 222–27; 229–34; 240–44; 246–48; 252–56)

We adopt in full Caballero's version of the reasons motivating Anselmo's sale of the shares and reject that put forth by the defendant. We find by a fair preponderance of the credible evidence that Anselmo's impetus for selling the stock was a combination of retaliation and desire to keep ownership in the hands of insiders. Further, the evidence fails to convince us that the financial circumstances of SICC were threatened at the time of the sale.

There is no question that Anselmo was angry at Caballero for leaving his employ. Anselmo testified to his apprehension that Caballero's new and competitive business would damage SICC (Tr. 321); and expressed his belief that Caballero had appropriated a key idea which had already been presented to a major client of SICC (Tr. 321) Fully aware that at the time Caballero began his new venture he was without employees, assisted only by his wife (Tr. 362), and with the personal knowledge that it had taken Anselmo eight months to build SIN into a company that could sell radio time on a national scale (Tr. 362), the defendant nevertheless waited only six weeks

after Caballero's departure to sell his daughter's stock. (Tr. 72–73) We find that under the circumstances and despite Anselmo's insistence to the contrary, his anger played a major role in the relatively quick sale of the stock.

We further conclude that maintaining ownership in the hands of SICC employees was extremely important to Anselmo. Ms. Safina testified that Anselmo gifted her with shares of stock in SICC for her wedding. When Ms. Safina left the company, Anselmo unsuccessfully attempted to have her return the shares. He wrote her the following letter:

> At the time of your marriage and as a gesture of appreciation for the excellent work you had rendered this company, I caused Spanish International Network to buy and give to you as a wedding gift 151 shares of stock in SICC. You never bought the stock. You never paid for it. Now you make reference in your letter to the fact that you "own the shares." You will never "own these shares", Maria. You only possess them. Spiritually and morally you will never own what is not rightfully acquired, and in view of your broken promise to Gloria, any profit you derive from this stock will be ill begotten and of little satisfaction to you. You may also choose to stay on as a shareholder for whatever obtuse satisfaction you may gain from that, but is it really worth it, Maria? I mean, what are you doing to yourself, your name and your reputation?"

(Tr. 169–171, Ex. 8)

It is our opinion that the same attitude that attempted to force Anselmo's then ex-employee Ms. Safina into return of her stock governed the decision to sell plaintiff's shares. Our conclusion is bolstered by the fact that the shares were ultimately sold to another owner of corporate stock, Daniel Villaneuva. (Ex. A–2)

Finally, our review of the record convinces us that the financial outlook for SICC at the time of the sale of the stock was favorable. SICC had successfuly negotiated a 3.2 million dollar loan from Marine Midland Bank in January of 1973; Anselmo sub-

mitted favorable five year projections for SICC to the bank in order to obtain the loan. Furthermore, Anselmo had a report prepared by Blackburn and Company, a well-known firm in the television appraisal industry, (Tr. 283) which indicated that the outlook for SICC was excellent, and that the company showed great potential for growth. (Tr. 279–80; 282–92; Ex. 10) Indeed, Anselmo, who did not sell any of his personal shares in SICC (Tr. 359; S.F. 38), must have believed the company was and would continue to be successful. In sum, we find that Anselmo's decision to sell plaintiff's shares resulted not from his concern for her welfare, but rather from his own personal agenda.

In 1978, Caballero contacted Kaufman regarding business unrelated to the shares at issue in the instant litigation. (Tr. 109) At that meeting, Kaufman advised Caballero that he was no longer the owner of the stock. (Tr. 86) The two parties had no further conversations regarding this matter. (Tr. 86)

### CONCLUSIONS OF LAW

Before addressing the substantive claims in this action, we dispose of the objection by counsel for defendant Anselmo to the testimony of Ms. Safina concerning Exhibit 8 as well as to the introduction of that exhibit. We reserved decision at trial amd now decide in favor of their admission.

### I. *Objection to Exhibit 8*

█ Anselmo claims that Exhibit 8, the letter written to Ms. Safina after she left the employ of SIN, and her testimony surrounding it are not relevant and should therefore not be admitted. We disagree.

Broad discretion is vested in the trial court for the determination of whether evidence should be admitted based on, *inter alia,* relevance. *See Young v. Illinois Central Gulf Railroad Co.,* 618 F.2d 332, 337 (5th Cir.1980). Both the Federal Rules of Evidence and judicial application thereof favor the admission of evidence rather than its exclusion if it has any probative value at all. *United States v. Carranco,* 551 F.2d 1197, 1200 (10th Cir.1977). "The question

of relevancy is entrusted to the trial judge's discretion, and turns in part on the rule of substantive law at issue." *O'Rourke v. Eastern Air Lines, Inc.,* 730 F.2d 842, 854 (2d Cir.1984).

Anselmo claims that he was a trustee for plaintiff's shares and that he acted in good faith by selling them based on his belief that they were no longer a prudent investment. (Tr. 257) He maintains that the only motivation behind the sale of the shares was his concern for plaintiff's welfare. (Tr. 257) He denies that he acted in his own interests or in the interests of SICC, or that anger or spite prompted his actions. (Tr. 313) The testimony of Ms. Safina discredits this position and is relevant to Anselmo's motives in selling plaintiff's shares. Accordingly, defendant Anselmo's objection to the introduction of this evidence is overruled.

### II. *The Substantive Issues*

The plaintiff's claims are premised on four legal theories: Anselmo's breach of fiduciary duty as trustee if a trust existed, breach of fiduciary duty of Anselmo and Kaufman as officers and directors of SICC, conversion and conspiracy. We will now turn to each issue.

### A) WAS A VALID ORAL TRUST CREATED?

One of the pivotal issues in this case is whether a valid trust was created at the time Caballero told Anselmo to vote plaintiff's shares. Plaintiff proceeds under the premise that there was no trust relationship, and therefore Anselmo had no authority to hypothecate and sell the stock belonging to her. Anselmo maintains that Caballero as guardian of plaintiff appointed him trustee of the shares, giving him full authority to deal with the shares as he saw fit, including selling them.

█ New York law requires the presence of the following elements to create a valid trust: a designated beneficiary, a designated trustee who is not the same person as the beneficiary, a clearly identifiable res, and delivery of the res by the settlor to the

trustee with the intent of vesting legal title in the trustee. *See Agudas Chasidei Chabad of U.S. v. Gourary*, 833 F.2d 431, 434 (2d Cir.1987); *Brown v. Spohr*, 180 N.Y. 201, 209, 73 N.E. 14, 16–17 (1904); *In re Frank*, 52 A.D.2d 335, 338, 383 N.Y.S.2d 777, 779 (4th Dep't 1976); *In re Estate of Fontanella*, 33 A.D.2d 29, 31, 304 N.Y.S.2d 829, 832 (3d Dep't 1969); *In re Estate of Carney*, 73 Misc.2d 579, 341 N.Y.S.2d 668, 669 (Surrogate's Court, N.Y.Co.1973). A trust may be created orally or in writing, and no particular form of words is necessary. *See Agudas, supra*, 833 F.2d at 434; *Martin v. Funk*, 75 N.Y. 134, 141 (1878); *Lefkowitz v. Cornell University*, 35 A.D.2d 166, 173, 316 N.Y.S.2d 264, 271 (4th Dep't 1970), *aff'd*, 28 N.Y.2d 876, 271 N.E.2d 552, 322 N.Y.S.2d 717 (1971). Further, a trust may arise by implication "from the acts or words of the person creating it," as long as the intent to create such an implied trust arises as a necessary inference from unequivocal evidence. *Wadd v. Hazelton*, 137 N.Y. 215, 219, 33 N.E. 143, 144 (1893); *see Elyachar v. Gerel Corp.*, 583 F.Supp. 907, 922 (S.D.N.Y.1984) ("The words and acts relied upon must be unequivocal in nature and admit of no other interpretation than that the property was to be held in trust."); *Hoffman v. Union Dime Savings Institution*, 109 A.D. 24, 27, 95 N.Y.S. 1045, 1048 (1st Dep't 1905).

■ In the absence of a specific direction to establish a trust, proof beyond a reasonable doubt of circumstances evidencing such intent by the settlor is required. *See Elyachar, supra*, 583 F.Supp. at 922; *Beaver v. Beaver*, 117 N.Y. 421, 428, 22 N.E. 940, 941 (1889); *In re Estate of Fontanella*, 33 A.D.2d 29, 31, 304 N.Y.S.2d 829, 832 (3d Dep't 1969); *Payne v. Connelly*, 32 A.D.2d 693, 694, 299 N.Y.S.2d 1013, 1016 (3d Dep't 1969); *Hoffman, supra*, 109 A.D. at 27, 95 N.Y.S. at 1048. The reasoning behind the application of the "beyond a reasonable doubt" standard is insurance of ownership and avoidance of perjury or fraud that could result from alleged donees claiming to have interests in trust property. *See Elyachar, supra*, 583 F.Supp. at 922–23; *In re Estate of Fontanella, supra*, 33

A.D.2d at 31, 304 N.Y.S.2d at 832; *Young v. Young*, 80 N.Y. 422, 438 (1880).

■ In the case before us, the absence of a written instrument evidencing a trust is uncontested. Therefore, the inquiry becomes whether Anselmo has satisfied his stringent burden of proving that the actions and the words of Caballero, the alleged settlor, intended to create a trust. *See In re Shulman Transport Enterprises, Inc.*, 21 B.R. 548, 552 (Bankr.S.D.N.Y. 1982), *aff'd*, 33 B.R. 383 (S.D.N.Y.1983), *aff'd*, 744 F.2d 293 (2d Cir.1984) (The burden of establishing the creation of an oral trust is on the party who seeks to assert that a trust existed). For the reasons set forth hereinbelow, we answer this query in the negative.

First, we note that at no time did Caballero request Anselmo to do anything more than "vote" the shares—an arrangement he believed necessary to comply with the FCC rules. Indeed, had he understood that a trust relationship was mandated in order to resolve the voting issue, he would have executed a formal written document which he mistakenly, based on his prior experience, thought the law required concerning trust agreements.

Caballero did not use the word "trustee" with respect to Anselmo's relationship to plaintiff and her shares until after they were sold. Moreover, his employment of the term at that time was merely in response to his review of the FCC filings in which Anselmo had so listed himself (without any authority therefor). We adopt as true Caballero's testimony that his failure to object to the use of the word reflected his belief, again based on Cuban law, that a trustee was required to obtain judicial approval before selling stock.

The intent to create a trust and even the use of the word "trust" do not compel the finding that a trust has been created. *Merritt-Chapman & Scott Corp. v. Public Utility Dist.*, 237 F.Supp. 985, 994 (S.D.N.Y.1965). Rather, the courts will look to the substance of the relationship between the parties rather than the language employed by them. *See In re Materetsky*, 28 B.R.

499, 502 (Bankr.S.D.N.Y.1983). Under the circumstances, we find that Caballero's use of the word "trustee" after reading the FCC report was not enough to establish a legal trust, particularly in light of his failure to give Anselmo any other basis to believe that a trust relationship was being formed.

Nor do we agree with Anselmo's argument that since the voting rights were not conveyed in writing, and both New York and Delaware law require that a voting trust be in writing (SICC is a Delaware corporation), a full custodial trust must have been created at the time Caballero told Anselmo to vote the shares. This contention contravenes the purpose behind the law of trusts, which is to protect a property owner from interference with his or her rights by allowing ambiguous and uncertain arrangements to be classified as trusts. *See Elyachar, supra,* 583 F.Supp. at 922. It is a position we decline to adopt.

We also find unpersuasive Anselmo's further argument that a trust was created because any other arrangement would have been "illegal." Title 47 of the United States Code, Section 310 provides, in pertinent part:

**Section 310. License ownership restrictions**

(b) Grant to or holding by alien of representative. No broadcast or common carrier or aeronautical en route or aeronautical fixed radio station license shall be granted to or held by— ...

(3) any corporation of which any officer or director is an alien of which more than one-fifth of the capital stock is owned of record or voted by aliens or their representatives or by a foreign government or representative thereof or by any corporation organized under the laws of a foreign country.

Section 310 restricts corporations, not individuals. *See Telemundo, Inc. v. F.C.C.,* 802 F.2d 513, 516 (D.C.Cir.1986); *Request for Declaratory Ruling Concerning the Citizenship Requirements of Sections 310(b)(3) and (4) of the Communications Act of 1934, as amended,* 103 F.C.C.2d 511 (1986); *In Re Request by Data Trans-* *mission Co. for a Declaratory Ruling Concerning Alien Ownership,* 52 F.C.C.2d 439 (1975). The penalty for violation of this section is revocation of the license of a company which bears the responsibility of ensuring compliance with FCC regulations. However, the statute is not directed at stockholders; nothing in its terms or intent precludes a person situated similarly to Caballero to own or vote corporate stock. Thus, Anselmo's characterization of any arrangement other than a trust relationship as being illegal is inaccurate.

In further support of his contention, Anselmo quotes from a 1984 FCC report entitled, *In the Matter of Corporate Ownership Reporting and Disclosure by Broadcast Licensees,* 97 F.C.C.2d 997 (1984). The last sentence of the paragraph therein reads: "In any case, if the beneficiary or grantor of a trust is to avoid attribution of the stock, *the trustee must be an independent person with no familial or business relationship with the beneficiary or grantor*" (emphasis added). Contrary to Anselmo's argument, this sentence specifically precludes him from serving as trustee since he was the employer of Caballero and therefore in a business relationship with the alleged grantor. Pursuant to this report, had Anselmo served as trustee, the stock would have been attributed to Caballero, a foreigner, and SICC would therefore have been in violation of the FCC requirements.

Finally, we find it significant that despite Anselmo's insistence that the FCC rule requires our finding in favor of the existence of a trust, the first time an ownership report mentioning plaintiff was filed with the FCC, the report identified the arrangement between plaintiff and Anselmo as "Stockholder, Rosa Maria Caballero", and below that designation on the same form, "voted by Rene Anselmo." (Ex. 13) We find this description evidences Anselmo's knowledge that Caballero had no intention of creating anything more than a relationship in which Anselmo voted plaintiff's shares.

In sum, our examination of all the relevant facts and circumstances, with particu-

lar emphasis on the actions and words of Caballero, the alleged settlor, compels us to conclude that no trust relationship was created at the time Caballero told Anselmo to vote the shares belonging to his daughter.

## B) ANSELMO'S BREACH OF FIDUCIARY DUTY AS TRUSTEE

As we have discussed at length above, we find that no trust was created in this case. Accordingly, plaintiff's second, third, fourth and fifth claims, all predicated on the existence of a trust relationship, must be dismissed.

## C) CONVERSION

The fundamental theory of plaintiff's case is that defendant Anselmo wrongfully converted the shares that belonged to plaintiff by hypothecating them to secure a bank loan and by later selling them.

■ A disposition of the property of another, without right, as if it were one's own, constitutes a conversion under New York law. *United States v. Santiago,* 528 F.2d 1130, 1135 (2d Cir.), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976); *United States v. Goad,* 490 F.2d 1158, 1166–68 (8th Cir.), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974); *see Kamienska v. County of Westchester,* 39 Misc.2d 750, 753, 241 N.Y.S.2d 814, 817 (Westchester Co.1963). "To establish a cause of action for conversion, plaintiff must show legal ownership or an immediate superior right of possession and the exercise by defendant of unauthorized dominion over the amount in question, to the exclusion of plaintiff's rights." *AMF Inc. v. Algo Distributors, Ltd.,* 48 A.D.2d 352, 356–357, 369 N.Y.S.2d 460, 464 (2d Dep't. 1975); *First National Bank of Highland v. Merchant's Mutual Insurance Company,* 89 Misc.2d 771, 774, 392 N.Y.S.2d 836, 838 (Sup.Ct. Ulster Co.1977), *aff'd,* 65 A.D.2d 59, 410 N.Y.S.2d 679 (3d Dep't. 1978), *rev'd on other grounds,* 49 N.Y.2d 725, 402 N.E.2d 1168, 426 N.Y.S.2d 267 (1980); *see Kamienska v. County of Westchester,* 39 Misc.2d 750, 753, 241 N.Y.S.2d 814, 817 (Westchester Co.1963) (principle behind conversion is the unwarranted interference and assertion of control by a defendant over the property of a plaintiff, resulting in injury to the latter).

■ We entertain no hesitancy in concluding that plaintiff satisfied her burden of proof with respect to her claim against Anselmo grounded on conversion. First, the evidence overwhelmingly demonstrates that she was the owner of the shares which were purchased by her father and given to her as a gift. Indeed, the initial FCC filing concerning the stock—which was described at trial as "accurate" by counsel to SICC, Norman Levanthal, Esq. (Tr. 376)—identified plaintiff as the shareholder of record and Anselmo as the person charged with voting her shares. (Ex. 13)

Next, Anselmo hypothecated and ultimately sold the shares in which he was vested with no legal rights to Kaufman. In doing so, he exercised unauthorized control over the stock, wrongfully depriving plaintiff of her property. *See AMF Inc. v. Algo Distributors, Ltd., supra,* 48 A.D.2d at 356–57, 369 N.Y.S.2d at 464; *First National Bank of Highland v. Merchant's Mutual Insurance Company, supra,* 89 Misc.2d at 774, 392 N.Y.S.2d at 838; *Kamienska v. County of Westchester, supra,* 39 Misc.2d at 753, 241 N.Y.S.2d at 817. All of the elements of conversion having been established, we conclude that Anselmo is liable to plaintiff for conversion of her shares.

## D) ANSELMO AND KAUFMAN'S BREACH OF FIDUCIARY DUTY AS DIRECTORS OF SICC

■ Plaintiff's sixth claim is predicated on the breach of fiduciary duty of Anselmo and Kaufman to plaintiff in their capacity as directors of SICC, allegedly by failing to act in the best interests of a stockholder (plaintiff) and by selling her shares in their own self-interests. Since SICC is a Delaware corporation (Ex. H–1) and New York follows the rule that the law of the state of incorporation governs the existence and extent of corporate fiduciary obligations as well as the liability for violations of such obligations, we are obliged to apply the law of Delaware in regard to this claim. *See*

*Gildenhorn v. Lums, Inc.,* 335 F.Supp. 329, 332 (S.D.N.Y.1971) (citations omitted).

■ Delaware corporations law provides that although directors generally do not occupy a fiduciary position with respect to stockholders in direct personal dealing as opposed to dealings with stockholders as a class, Delaware does create such a duty in special circumstances where advantage is taken of inside information by a corporate insider who deliberately misleads an ignorant stockholder, when the latter relies on the misrepresentation or omission. *Kors v. Carey,* 39 Del.Ch. 47, 58, 158 A.2d 136, 143 (1960); *see St. Louis Union Trust Co. v. Merrill Lynch,* 562 F.2d 1040, 1055 (8th Cir.1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978); *Lank v. Steiner,* 43 Del.Ch. 262, 266–267, 224 A.2d 242, 245 (1966).

■ Plaintiff has not produced any evidence establishing that Anselmo and Kaufman took advantage of inside information to mislead plaintiff. Rather, in support of her argument that the two defendants breached their fiduciary duties, plaintiff cites only two cases, *Geddes v. Anaconda Copper Mining Co.,* 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425 (1921), and *Petty v. Penntech Papers, Inc.,* 347 A.2d 140 (Del.Ch. 1975), neither of which we find applicable to the instant controversy. Accordingly, we conclude that plaintiff has failed to prove her claim based on breach of fiduciary duty, and this cause of action must be dismissed.

## E) CONSPIRACY THEORY

Plaintiff's fourth and seventh claims are based on a conspiracy theory. In her fourth claim plaintiff asserts that defendant Kaufman conspired with Anselmo to deprive her of beneficial ownership of the shares by purchasing them at a price far below the fair market value of the stock. In the seventh claim, she alleges that Anselmo and Kaufman knowingly and intentionally conspired to deprive her of her lawful rights of ownership of the shares.

■ To establish a civil conspiracy in New York, the plaintiff must prove that the defendants intentionally participated in a common scheme with a view to its furtherance. *Bedard v. LaBier,* 20 Misc.2d 614, 617, 194 N.Y.S.2d 216, 220 (Sup.Ct. Clinton Co.1959). However, the actions of the alleged conspirators must state a claim in tort, since conspiracy is itself not a tort but rather a rule of responsibility for the tortious actions of others. *See Arlinghaus v. Ritenour,* 622 F.2d 629 (2d Cir.), *cert. denied,* 449 U.S. 1013, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980); *Bridge C.A.T. Scan Associates v. Ohio–Nuclear Inc.,* 608 F.Supp. 1187, 1193 (S.D.N.Y.1985).

■ There is simply no support in the record to sustain plaintiff's claim that Anselmo and Kaufman tortiously conspired to deprive plaintiff of her stock or that Kaufman conspired with Anselmo to purchase the stock for an unfair price. No proof was adduced at trial demonstrating a lack of good faith on the part of Kaufman in purchasing the shares from Anselmo. Furthermore, plaintiff appears to have abandoned this claim entirely; she cites no case law on this point nor does she present an argument in her post-trial brief. Accordingly, plaintiff's fourth and seventh claims alleging conspiracy causes of action must be dismissed.

## F) CONCLUSION

For the reasons set forth hereinabove, we find in favor of plaintiff and against defendant Anselmo on the grounds that the latter wrongfully converted her shares of SICC stock. We do not find, however, that plaintiff has successfully satisfied her burden of proof on her claims against defendant Kaufman.

Prior to addressing the issue of damages, we proceed to follow a practice that has met with great success in this Court: We direct plaintiff and defendant Anselmo to endeavor to agree upon a reasonable and proper amount of damages, and to provide us with a proposed form of judgment including such amount agreed upon. If the parties cannot reach an agreement within 60 days of the filing date of this opinion, they are to notify us in writing and a date will be fixed for trial strictly limited to the

issue of damages owing to plaintiff from defendant Anselmo.

SO ORDERED: