LOGAN & KANAWHA COAL COMPANY, INC.,
Plaintiff,

v.

BANQUE FRANCAISE DU COMMERCE EXTERIEUR, CTC–Minemet, Inc., Coalco Ltd., Richard Thomas and Emile Battat, Defendants.

No. 93 Civ. 4678 (LBS).

United States District Court,
S.D. New York.

Nov. 10, 1994.

64

William M. Broderick, New York City, for plaintiff; Joseph P. Callahan, of counsel.

Kevin Mac Carthy Associates, P.C., and Ross & Hardies, New York City, for defendant Banque Francaise Du Commerce Exterieur; Kevin Mac Carthy, Helen Davis Chaitman, Candida Paris, Sean M. Sullivan, of counsel.

## OPINION

SAND, District Judge.

Plaintiff Logan & Kanawha Coal Company, Inc. ("L & K") asserts several claims against defendant Banque Francaise du Commerce Exterieur (the "Bank"), stemming from certain transactions involving defendant Bank and former defendant CTC–Minemet, Inc. ("CTC").[1] Defendant Bank now moves to dismiss plaintiff's complaint pursuant to Rule 12(b)(6), or in the alternative, for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Plaintiff also moves for summary judgment. For the reasons set forth below, defendant's motion is denied in part and granted in part. Plaintiff's cross motion for summary judgment is denied.

## BACKGROUND

Plaintiff L & K is an Ohio corporation in the business of selling coal to both domestic and foreign markets. Complaint ¶ 1. Defendant Bank is a French corporation licensed to engage in the banking business within the State of New York. Def.'s Mem. Dated Apr. 15, 1994. This action centers around a sum of $1,255,452 that was pledged to defendant Bank by former defendant CTC and consequently paid to the Bank by a French purchasing organization known as Association Technique de l'Importation Charbonniere ("ATIC"). Plaintiff claims that CTC had no right to pledge this money to the Bank and that $1,242,641 of this amount should instead have been paid to plaintiff.

From 1989 to 1993, plaintiff had a business relationship with former defendant CTC, the nature of which is a subject of dispute. Plaintiff asserts that CTC acted from 1989 to 1993 as an "agent and broker" for plaintiff, finding French purchasers such as ATIC for plaintiff's coal. Plaintiff's Mem. Dated June 8, 1994 at 1; Meyer Aff. ¶¶ 2–5. Plaintiff maintains that title to the coal never passed from plaintiff to CTC and that CTC remained merely plaintiff's agent throughout. Complaint ¶¶ 11–13; Meyer Affidavit ¶¶ 2–5. Defendant Bank, by contrast, characterizes the arrangement between L & K and CTC as one in which L & K sold its coal to CTC, which then resold it to French purchasers like ATIC. Bank's Mem. Dated Apr. 15, 1994 at 1.

Although the parties disagree as to whether CTC acted as an agent or a buyer/seller, they do not dispute that in March 1993, CTC arranged and carried out the transfer of a shipment of coal from L & K to ATIC. Pl.'s Mem. at 1; LaCourte Aff. Dated June 23, 1994 ¶¶ 4–5. This transfer of coal involved a dual set of invoices; the first from L & K to CTC was in the sum of $1,242,641 and the second from CTC to ATIC (the "ATIC invoice") was in the sum of $1,255,452. Pl.'s Mem. at 1. The difference between these two sums, alleges plaintiff, was intended to represent CTC's commission on the sale of coal from L & K to ATIC. Pl.'s Mem. at 1.

In December 1991, CTC had entered into a Revolving Credit Agreement with defendant Bank, pursuant to which the Bank loaned money to CTC. Ex. A to LaCourte Aff. Dated June 23, 1994. The parties do not dispute that, in March 1993, CTC assigned the "ATIC invoice" to defendant Bank as collateral under the 1991 Revolving Credit Agreement. Pl's Mem. at 2; LaCourte Aff. Dated June 23, 1994 ¶ 5. After receiving its shipment of coal, ATIC paid this sum of $1,255,452 directly to defendant Bank, which applied this payment to the outstanding debt of CTC to the Bank. Pl.'s Mem. at 2; Def.'s Rule 3(g) Statement at 5. CTC, which had financial problems and eventually became insolvent, failed to pay plaintiff the sum of $1,242,642 allegedly owed for the coal shipped from plaintiff to ATIC. Certif. at ¶ 5; Pl's Mem. at 2, 3. Plaintiff consequently brought this action against the Bank, CTC, and the other named defendants in July 1993. As discussed above, the Bank is the

---

1. In addition to defendant Bank, plaintiff originally brought claims against CTC–Minemet, Inc., Coalco Ltd., Richard Thomas and Emile Battat. *See* Complaint ¶¶ 1–6. On December 15, 1993, plaintiff entered into a stipulation of settlement with all defendants except for the Bank, pursuant to which a consent judgment was entered against CTC and plaintiff gave general releases to Thomas, Battat and Coalco. Bank's Mem. Dated Apr. 15, 1994 at 3–4. Thus, the only remaining claims are those against defendant Bank.

only remaining defendant in this litigation. *See supra* note 1.

## DISCUSSION

### A.  *UCC Article 9*

██ Plaintiff alleges that when CTC assigned to defendant Bank the ATIC invoice for $1,255,452, CTC had no more than a minimal interest in the ATIC invoice. This assignment of collateral, argues plaintiff, was therefore invalid under article 9 of the Uniform Commercial Code. *See* Complaint ¶¶ 40, 44 ("Second Cause of Action"). Defendant moves for summary judgment as to this claim. Because we find that there is a genuine issue of material fact as to whether CTC had rights in the ATIC invoice, we deny defendant's motion.

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. *See Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). All ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *See Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d 30, 32 (2d Cir.1993). When no rational jury could find in favor of the non-moving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988).

Article 9 of the Uniform Commercial Code sets forth the law of secured transactions. Pursuant to section 9–203 of the code, a security interest does not attach unless: (a) the collateral is in the possession of the secured party, or the debtor has signed a security agreement which describes the collateral; (b) the secured party has given value to the debtor; and (c) the *debtor has rights in the collateral.* N.Y.U.C.C. § 9–203(1) (McKinney 1990) (emphasis added). *See In re Emergency Beacon Corp.*, 665 F.2d 36, 40 (2nd Cir.1981) ("Notwithstanding any agreement between the debtor and the creditor, if the debtor has no rights in the collateral, no security interest in that collateral comes into existence."). The question presented by plaintiff's claim is whether CTC had rights in the ATIC invoice to which the Bank's security interest could attach. *See, e.g., Cantor v. Anderson*, 639 F.Supp. 364, 368 (S.D.N.Y.) (art dealer entrusted with painting did not have "rights in the collateral" and could not pledge the painting to a third party), *aff'd.*, 833 F.2d 1002 (2nd Cir.1986).

Plaintiff argues that CTC had no rights in the ATIC invoice because CTC was only plaintiff's "agent and broker," whose role was to arrange the sale of coal from CTC to ATIC in return for a one percent commission. *See Lincoln First Commercial Corp. v. New York State Tax Comm'n*, 136 Misc.2d 478, 518 N.Y.S.2d 904, 906 (N.Y.Sup.Ct.1987) (wholesale distributor of cigarettes was agent of government for purposes of collection of cigarette tax, and as such, did not possess type of rights in cigarette tax stamps which could be pledged as security interest for a loan). In support of this claim, plaintiff offers the affidavit of L & K's president, as well as several pieces of correspondence between L & K and CTC, referring to CTC as an "agent" and its compensation as a "commission" rather than a profit. *See* Meyer Aff. ¶¶ 2–5 and Exs. A–C. Plaintiff also offers a Bill of Lading and other shipping documents indicating that ownership of coal passed directly from L & K to ATIC in 1993. *See* Meyer Aff. ¶¶ 11–15 and Exs. G–H.

Defendant Bank, by contrast, asserts that the arrangement between L & K and CTC was one in which L & K sold its coal to CTC,

which then resold it to ATIC. Therefore, according to defendant, CTC did have "rights in the collateral" to which the Bank's security interest could attach. In support of this position, the Bank offers the certification of the president of CTC, *see* Battat Cert. ¶¶ 2–4, as well as an L & K invoice referring to a "buyer-seller" agreement between L & K and CTC. Ex. C to LaCourte Aff. Dated June 23, 1994. It also offers an alleged contract between ATIC and CTC for the sale of coal, referring to ATIC as "buyer" and CTC as "seller." Ex. B to LaCourte Aff. Dated June 23, 1994.

Examining the evidence of both parties, we conclude that defendants have not met their burden of demonstrating a lack of factual questions as to whether CTC had "rights in the collateral." On the evidence presented so far, we believe that a rational jury could find either that CTC was plaintiff's agent without a substantial interest in the coal or that CTC was the seller of the coal with rights in the profits to which the Bank's security interest could attach. Because a genuine issue of material fact remains, we deny defendant's motion for summary judgment as to plaintiff's "Second Cause of Action." [2]

### B. *Conspiracy to Defraud*

Second, plaintiff alleges that defendant Bank's acceptance of the ATIC invoice from CTC as collateral under the Revolving Credit Agreement was part of a conspiracy between the Bank and CTC to perpetrate a fraud upon plaintiff. *See* Complaint ¶¶ 60–62 ("Sixth Cause of Action"). Defendant argues that plaintiff's allegations of conspiracy are "unsupported" and "conclusory" and that we should therefore dismiss plaintiff's claim. Def.'s Reply Mem. at 26. We reject defendant's argument.

■ In New York, the tort of fraud requires proof of five traditional elements:

(1) a material fact; (2) misrepresentation of that material fact; (3) scienter; (4) reliance; and (5) damages. *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2nd Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). Although "civil conspiracy" is itself not a substantive tort in New York, a claim of conspiracy can rest upon an independent underlying claim of fraud. *See Demalco Ltd. v. Feltner*, 588 F.Supp. 1277, 1278–79 (S.D.N.Y.1984) ("the gravamen of a claim of conspiracy is the underlying independent tort"). "To establish a civil conspiracy in New York, the plaintiff must prove that the defendants intentionally participated in a common scheme with a view to its furtherance." *Caballero v. Anselmo*, 720 F.Supp. 1088, 1099 (S.D.N.Y.1989). One party therefore can be liable for conspiracy to commit fraud by knowingly agreeing to cooperate in the fraudulent scheme of another party. *See National Westminster Bank USA v. Weksel*, 124 A.D.2d 144, 511 N.Y.S.2d 626, 628–29 (N.Y.App.Div.), *appeal denied*, 70 N.Y.2d 604, 519 N.Y.S.2d 1027, 513 N.E.2d 1307 (1987).

■ Plaintiff does not allege that defendant Bank satisfied the five elements of fraud directly, but rather alleges that the Bank knowingly cooperated in CTC's fraudulent acts. Pl's Mem. at 15. CTC committed fraud, argues plaintiff, by pledging its principal's property to the Bank as collateral and misrepresenting it as its own. *Id.* Plaintiff contends that the Bank was aware of these facts at the time it accepted the ATIC invoice as collateral and that it therefore should be liable for conspiracy to commit fraud. *Id.*

In support of these allegations, plaintiff argues that the Bank, as a lender of $3,000,-000 to CTC, was likely to have acquainted itself with the business practices of its borrower and therefore should have known that CTC was only an agent of L & K. Meyer

---

**2.** Defendant argues that even if the transaction between L & K and CTC was not a sale, L & K is estopped from asserting that CTC did not have "rights in the collateral." According to defendant, L & K should be estopped because it "clothed" CTC with apparent ownership rights in the underlying coal by structuring the transaction as a sale by L & K to CTC and a resale by CTC to ATIC. Def.'s Reply Mem. at 8–13. This argument, however, assumes that defendant Bank was unaware of the true relationship between L & K and CTC. Because we believe that there is a genuine issue of material fact as to this matter, *see infra* pp. 67–68, we reject defendant's argument and save this matter for trial.

Aff. ¶ 10. In addition, plaintiff offers evidence of a contemplated "intercreditor agreement" between defendant Bank and another French bank that allegedly owned part of or had "some kind of relationship" with CTC. Transcript Dated June 27, 1994 ("Tr.") at 22; Ex. A to LaCourte Aff. Dated Apr. 14, 1994. Plaintiff argues that this relationship raises an inference that defendant Bank was aware of the nature of CTC's business. Pl.'s Mem. at 3–4. Finally, plaintiff offers two balance sheets, which the Bank allegedly had in its possession at the time it extended credit to CTC, showing CTC's liabilities to exceed its assets for the years ending Decembers 1990 and 1991. Exs. E & F to Meyer Aff. The fact that defendant Bank extended a $3,000,-000 line of credit to CTC notwithstanding CTC's "disastrous financial condition" indicates, plaintiff argues, a possible scheme by the Bank and CTC to "transfer the losses experienced by CTC's French owners" to American companies like L & K. Meyer Aff. ¶ 8.

Although the question whether plaintiff's allegations of conspiracy to commit fraud are pleaded with the level of detail required to withstand a motion of summary judgment is a close one, it seems that defendant Bank has exclusive knowledge as to whether it intentionally cooperated in any fraudulent activities undertaken by CTC. Plaintiff requests an opportunity for discovery, in order to investigate further the Bank's relationship to CTC and its knowledge of the nature of CTC's business. Pl.'s Mem. at 15; Tr. at 22. Under the circumstances, we find that plaintiff's failure to state in greater detail the circumstances constituting conspiracy to commit fraud is no basis for a grant of summary judgment in favor of defendant. Instead, plaintiff should be given the opportunity it requests to conduct further discovery. We therefore deny defendant's motion as to plaintiff's "Sixth Cause of Action."

C. *New York General Business Law Section 349*

■ Third, plaintiff alleges that defendant Bank's actions as alleged above constituted an actionable "deceptive act or practice" under section 349 of the New York General Business Law. *See* Complaint ¶¶ 57–59 ("Fifth Cause of Action"). Because we find that plaintiff fails to state a claim for which relief may be granted, we dismiss this claim pursuant to Rule 12(b)(6).

■ Section 349 provides a private right of action for "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]." N.Y.Gen.Bus.Law §§ 349(a) and (h) (McKinney 1988). As evidenced by its title ("Consumer Protection From Deceptive Acts and Practices"), this section was intended as a consumer protection law, and it has been construed by the courts to be inapplicable to "business-versus-business disputes . . . where the party asserting the claim is not acting in a consumer role." Richard A. Givens, *Supplementary Practice Commentary*, N.Y.Gen.Bus.Law §§ 349–350, at 129 (McKinney Supp.1994). The leading opinion discussing the scope of this section is *Genesco Entertainment v. Koch*, 593 F.Supp. 743 (S.D.N.Y.1984), in which Judge Weinfeld wrote:

> The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising. The consumer oriented nature of the statute is evidenced by the remedies it provides. . . . The New York cases where plaintiffs have recovered under section 349(h) further reflect its consumer orientation since they uniformly involve transactions where the amount in controversy is small. That the deceptive practices this statute seeks to combat involve recurring transactions of a consumer type is further supported by the origin of the statute. Section 349(h) is substantially modelled on the Federal Trade Commission Act [15 U.S.C. § 45].

*Genesco*, 593 F.Supp. at 751–52 (citations omitted). *See Morris v. Gilbert*, 649 F.Supp. 1491, 1496–97 (E.D.N.Y.1986) (statute inapplicable to security buyer's claims against brokerage firm salesman); *Quail Ridge Assocs. v. Chemical Bank*, 162 A.D.2d 917, 558 N.Y.S.2d 655, 658 (N.Y.App.Div.) (statute inapplicable to "single shot" commercial trans-

action involving multimillion dollar loan to developer to finance development of condominium complex), *appeal dismissed*, 76 N.Y.2d 936, 563 N.Y.S.2d 64, 564 N.E.2d 674 (1990).

In this Court's opinion, the present case does not involve the sort of consumer deception that falls within the scope of section 349. Plaintiff does not allege false and misleading advertising, or "recurring transactions of a consumer type." *Genesco*, 593 F.Supp. at 752. On the contrary, plaintiff's claim involves "complex arrangements, knowledgeable and experienced parties and large sums of money." *Id.* Because we find that section 349 is inapplicable to the transactions alleged, we dismiss plaintiff's "Fifth Cause of Action" for failure to state a claim for which relief can be granted.

### D. *International Banking Act and Regulation K*

█ Finally, plaintiff asserts an implied private right of action under the International Banking Act of 1978, 12 U.S.C. 3101 et seq. (the "IBA"), and Federal Reserve Board regulation K, 21 C.F.R. § 211, alleging that the Bank engaged in an "unsafe and unsound banking practice" causing injury to plaintiff. *See* Complaint ¶ 43 ("Second Cause of Action"). Defendant seeks a dismissal of this cause of action on the ground that it fails to state a claim for which relief may be granted. We agree with defendant and therefore dismiss plaintiff's claim.

█ Federal courts are considerably less willing to imply private rights of action than they were several decades ago. In recent years, the Supreme Court has repeatedly emphasized that whether an implied right of action exists under a federal statute is "strictly a matter of Congressional intent." *Chan v. City of New York*, 1 F.3d 96, 101 (2nd Cir.) (citing *Thompson v. Thompson*, 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988); *Northwest Airlines, Inc. v. Transport Workers*, 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979)), *cert. denied*, ── U.S. ──, 114 S.Ct. 472, 126 L.Ed.2d 423 (1993). When the stat-

ute is silent as to the existence of a private cause of action, courts normally consider the four factors set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975): (1) whether the plaintiff is part of the class for whose "especial benefit" the statute was enacted; (2) whether the legislative history indicates a congressional intent to confer a private right of action; (3) whether a federal cause of action would further the underlying purpose of the legislative scheme; and (4) whether the cause of action is "one traditionally relegated to state law." *Id.* at 78, 95 S.Ct. at 2087; *Chan*, 1 F.3d at 102. All four of these factors are "guides to determining congressional intent." *Chan*, 1 F.3d at 102.

Applying the *Cort* factors to the IBA and Regulation K, we find no indication of an intended private right of action. The language of the statute and regulation does not purport to protect any particular class of persons, but merely provides that the Federal Reserve Board may terminate a foreign bank's right to operate in the United States if it determines that the bank has engaged in "unsafe or unsound banking practices." *See* 12 U.S.C. §§ 3105(e)(1)(B)(i), 3106(c); 21 C.F.R. § 211.25(a). Second, the legislative history does not indicate any intent to create a private cause of action. Third, it is unclear whether implying a private right of action would further or undermine the underlying purpose of the legislative scheme. While allowing private parties to sue under the statute and regulation would undoubtedly deter "unsafe or unsound banking practices," it might also expose banks to severe liability, to the detriment of their shareholders and depositors. Finally, as evidenced by the numerous state claims in plaintiff's complaint stemming from the same alleged actions, the wrongdoings alleged by plaintiff in this case are matters traditionally governed by state law. Together, these four factors suggest that Congress did not intend to create a private right of action.

In light of the foregoing, this Court concludes that neither an express nor an implied private cause of action exists under the International Banking Act and Federal Reserve Board regulation K. Accordingly, we dismiss plaintiff's "Second Cause of Action"

insofar as it relies upon these federal banking laws.

## CONCLUSION

For the reasons set forth above, defendant's motion to dismiss plaintiff's complaint pursuant to Rule 12(b)(6), or in the alternative, for summary judgment pursuant to Rule 56, is denied in part and granted in part. Since, as discussed above, there are genuine issues of material fact to be resolved, plaintiff's cross motion for summary judgment is also denied.

The parties are to confer and to advise the court in writing by December 5, 1994 when all discovery will be completed, a pre-trial order submitted and the parties will be ready for trial.

SO ORDERED.